**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Howard HUNT et al., Defendants.**

**Crim. No. 66–66–SA.**

United States District Court
W. D. Texas,
San Antonio Division.

March 7, 1967.

Ernest Morgan, U. S. Dist. Atty., and Jamie Boyd, Asst. U. S. Dist. Atty., for the United States.

Warren Burnett, Odessa, Tex., and Luther E. Jones, Jr., Corpus Christi, Tex., for defendant, Howard Hunt.

MEMORANDUM AND RULING ON MOTION OF THE DEFENDANT HUNT TO QUASH THE JURY PANEL.

GRAVEN, Senior District Judge (by assignment).

An indictment was returned against the defendant, Howard Hunt, an attorney, and others charging them with conspiring to intimidate a prospective witness in a narcotics case. On his motion, his trial was severed from the trial of the other defendants. The case as to the defendant, Howard Hunt, hereinafter referred to as the defendant, came on for trial with jury on January 16, 1967. After the drawing of the jurors and after those drawn had been passed for cause and just prior to the exercising of peremptory challenges, the attorneys for the defendant requested a recess and in the absence of the jury stated that they had not theretofore had the oppor-

tunity to familiarize themselves with the composition of the jury panel and that the composition of the jury as just disclosed showed that it was an invalid panel. It was then agreed by the Court and the attorneys for the Government and the defendant that the hearing on the challenge would be postponed pending the outcome of the trial. On January 19, 1967, the jury returned a verdict finding the defendant guilty of the offense charged. Thereafter the defendant filed a motion in writing asking that an order be entered quashing the jury panel and adjudging invalid the jury chosen in the case. In that motion the defendant stated:

"Defendant's grounds for this motion are, that the clerk and the jury commissioner in compiling the jury list that is the source of such panel violated the federal statutory scheme applicable to jury selection by applying statutorily incorrect standards to prospective jurors, and that the method of obtaining names of prospective jurors for such list violated such scheme."

A hearing extending over three days was then held on the motion at which the parties presented a large amount of evidence.

The San Antonio Division consists of the following fourteen counties: Atascosa, Bandera, Bexar, Comal, Dimmit, Frio, Gonzales, Guadalupe, Karnes, Kendall, Kerr, Medina, Real and Wilson. The City of San Antonio is situated in Bexar County and that county constitutes a metropolitan area. Most of the other counties in the San Antonio Division are counties which are classified as predominantly rural areas. According to the estimates of the Bureau of Census, the present population of Bexar County is 836,363. The present number of its registered voters is 200,800. The population of Bexar County constitutes around seventy-five percent of the population of the San Antonio Division. The jury panel for this case contained jurors in varying numbers from thirteen of the counties. There were no jurors from one predom-

inantly rural county. The overwhelming number of the jurors were from Bexar County. There is no claim on the part of the defendant that there was any serious disproportion between the number of members on the present jury panel as between Bexar County and the other counties.

In order to focus attention on the questions involved in the challenge, it would seem to be desirable to note what questions are not involved. While, as noted, there were no jurors from one of the rural counties in the Division, it appears that names of prospective jurors from that county were in the so-called master jury box and that the absence of jurors from that particular county was due to the luck of the drawing.

There is not in issue in this case the matter of the violation of Subsection (c), Section 1863, Title 28 U.S.C.A., providing that no person shall be excluded from jury service because of race or color. Counsel for the defendant stated of record, in substance, that they were earlier of the view that discrimination may have prevailed in jury selection in this Division as to Negroes but the number of Negroes appearing on the panel "diluted" any contention on their part that Negroes were not proportionately represented on this particular panel. The reasons therefor next appear. According to the estimates of the Bureau of Census, the present number of Negroes in Bexar County is 50,182, or approximately six percent of the population of the county. There are no notations as to race as to the jurors in the so-called master jury box and the race of a juror is not brought out in voir dire examination or in any other way. The only way in which the presence of Negroes on a particular jury panel can be noted is by observation at the time the jurors report for service. On the jury that tried this case there were three Negroes and, therefore, they constituted twenty-five percent of the jury. There were two other Negroes on the panel. Apparently all the Negroes were from Bexar County. It would appear, in fact, that the Negroes were proportionately overrepresented on this particular panel. It is of interest to note that in the case of Brooks v. Beto (5th Cir. 1966), 366 F.2d 1, it was held that if there was a proper representation of Negroes on the particular jury panel with which the defendant was concerned, his constitutional rights were not violated even though such proper representation was achieved by the purposeful inclusion of Negroes. In the present case there is no proof or even suggestion that Negroes were purposely included on the particular panel from which the jury was selected that tried the defendant. The number of Negroes on the jury panel in this case would more strongly indicate that the sources made use of by the clerk and jury commissioner for the selection of Negroes for jury service were adequate. There is also ever present the luck of the drawing.

The attack of the defendant as to the validity of the jury panel in his case is related to Bexar County.

The challenges of the defendant are two in number. Those challenges of the defendant are largely based upon the case of Rabinowitz v. United States (5th Cir. 1966), 366 F.2d 34. That case and the companion case of Jackson v. United States were heard together en banc by eight judges. Judge Rives, a retired Circuit Judge, was ineligible to participate in the Rabinowitz case but was eligible to participate in the Jackson case. He wrote the opinion in the Jackson case which was adopted as the opinion of the Court. Judge Brown concurred specially. Judge Bell concurred in part and dissented in part. Judge Gewin concurred in the opinion of Judge Bell. Judge Coleman concurred in part and dissented in part. For convenience, the two cases will be referred to as the Rabinowitz case or Rabinowitz. Both cases centered around the matter of discrimination against Negroes in the matter of jury lists. There were two questions involved in Rabinowitz. The first question related to the matter of jury qualifications. In the majority opinion it was held that the clerk and jury commissioner had improperly added to the statutory qualifications for

jurors their "own ideas as to good character, intelligence and ability to 'understand the cases that are tried in court.'" It was stated (p. 51):

" * * * Instead of lowering the standards to the prescribed federal level, they have artificially raised the standards; in so doing they have eliminated many Negroes otherwise eligible to serve."

The other question involved in *Rabinowitz* was the question as to the adequacy of the sources utlilized by the clerk and jury commissioner in compiling their jury lists. In the majority opinion (p. 60), it was stated that those responsible for compiling the jury lists had assembled the lists from "grossly inadequate sources." In that case the Government in a supplemental brief stated that the evidence showed the jury list was made up in 1953 and was revised in 1959 after which 557 new names were added of which only a few were Negroes. The Government suggested that the convictions be reversed for new trials. The Court reversed the convictions and directed that the indictment be dismissed. Both cases involved challenges to the grand jury list and the trial jury list. In view of the concession made by the Government, all the judges were in agreement that the convictions should be reversed. Judges Bell, Gewin and Coleman dissented from the majority holding as to the matter of jury qualifications. The holding of the majority would seem to be encompassed in the following portion of the majority opinion (p. 55):

"In compiling the jury lists both the need for competency and the need for a fair cross-section of the community are important elements. In order to have a practical system of compiling jury lists and to insure that literate jurors are selected, some persons must be excluded. But the desire for competency must not be pursued to the extent that a fair cross-section is prevented. In promulgating orders under section 1863, the district court must be aware of this relationship and realize that Congress in prescribing the qualifications for jurors has attempted to insure a fair cross-section and has severely limited the court's discretion. The line of demarcation is clear—a person need only be able to read, write, speak, and understand English, he need not enjoy that degree of excellence found only among the more fortunate classes of our society. Any attempt to gain competent jurors that would result in a less representative cross-section than a selection drawn from the statutorily qualified pool would destroy the 'right' to serve on juries which Congress intended to confer, as well as destroy the broad based cross-section Congress has designated for federal juries."

In addition to the English language qualification referred to by the Court, there are, of course, the age, residence, nonconviction of a felony, and the mental and physical infirmities qualifications.

The procedures used in the San Antonio Division during the period of time here pertinent for the securing of names to be placed into what is termed the master jury box will next be noted.

Ever since 1941 there has been a committee of the Judicial Conference of the United States engaged in the study of the operation of the jury system in federal courts. That committee, for convenience, will be referred to as the Jury Committee.

In 1957, as a part of Civil Rights legislation, changes were made in the qualifications for federal court jurors. Following the enactment of those changes, the Jury Committee made a further study of jury selection in light of the changes. In 1960 it made a report containing a number of recommendations. Appended to the report were certain forms suggested for use in connection with jury selection. The report of the Jury Committee with suggested forms is found in 26 F.R.D., pp. 411–459.

The Western District of Texas and many of the other Federal Court Districts proceeded to follow the procedures recommended and the forms suggested

by the Jury Committee. The recommended method for securing names of persons for jury service was by means of suggesters or key men. By that method persons who would be expected to be acquainted with the various and different groups and elements in a particular community would be called upon to submit lists of qualified persons for jury service. The persons appearing on those lists were to be sent questionnaires. Upon return of the questionnaires, the clerk and the jury commissioner, to the extent needed, would place the names of those appearing thereon in the jury box.

The first challenge of the defendant based upon the claim that those having to do with the selection of jurors in this Division added qualifications for federal jury service in addition to the qualifications set out in Section 1861, Title 28 U.S.C.A., is largely based on a paragraph contained in the form of letter sent to suggesters which, as heretofore noted, was the form suggested by the Jury Committee. That form of letter is next set forth. The claimed offending paragraph is enclosed in brackets. The form of letter is as follows:

## UNITED STATES DISTRICT COURT

### Office of the Clerk

## WESTERN DISTRICT OF TEXAS

MAXEY HART
    Clerk

Dear Sir:

The right to trial by jury is one of our most cherished democratic traditions. However, this right can be a meaningful one only if jurors are capable and impartial and are selected without regard to race, color, creed, politics or station in life. The jury commissioners for the Federal Court at San Antonio are charged with the duty of getting jurors of this kind. Because such jurors should be drawn from all parts of the large area served by the San Antonio seat of Court and should represent all walks of life and points of view, Dr. Max E. Johnson and I, as the jury commissioners, need the help of conscientious and well-informed citizens in properly discharging this obligation. That is why we are calling on you to suggest the names of men and women in your community who, in your judgment, would make qualified jurors.

In making your suggestions, please keep the following statutory requirements in mind. To be qualified for jury duty, a man or woman must be:

1. Twenty-one years of age or over;

2. A citizen of the United States who has resided in the Western District of Texas for a period of one year;

3. Free from mental or physical infirmities which would interfere with the efficient performance of jury duty;

4. Free from ever having been convicted of a crime punishable by imprisonment for more than one year;

5. Able to read, write, speak and understand the English language.

[In addition to the statutory qualification, please bear in mind that a prospective juror should be esteemed in his community as a person of good character, approved integrity, sound judgment and fair education. In determining 'esteem', please keep in mind that this does not require wide public recognition or high place. Integrity, intelligence, sound judgment, a sense of responsibility—in short, all those qualities of a first-class citizen which cause a man to be esteemed by his fellows—are to be found among the unheralded just as often as among the prominent.]

It is because Dr. Johnson and I feel that you are in a position to know citizens who measure up to all of these standards that we are calling on you. For your convenience, we are enclosing a sheet on which to list your candidates. In making up this list, we ask that you make a conscious effort to include both men and women from a variety of backgrounds and occupations so as to give us, as nearly as possible, a representative cross-section of your community. Please list up to twenty names on this sheet, sign it, and return it in the enclosed envelope which requires no postage. Naturally, your suggestions will be kept in strictest confidence by us. Although we do not want you to act hastily in the important task of making up your list, we ask that you return it promptly.

Believe us, your help is urgently needed. Your only reward will be the knowledge that you have made an important contribution to the better functioning of a vital democratic institution. We are sure that for you this will be reward enough.

Most sincerely,
/s/ Maxey Hart

MAXEY HART
Clerk, U. S. District Court for
The Western District of Texas. "

———◆———

In its report of the Jury Committee referred to, the Committee stated (p. 421 of 26 F.R.D.):

"The choice of specific sources from which names of prospective jurors are selected must be entrusted to the clerk and jury commissioner, acting under the direction of the district judge, but should be controlled by the following considerations: (1) the sources should be coordinated to include all groups in the community; (2) economic and social status including race and color should be considered for the sole purpose of preventing discrimination or quota selection; (3) women are now eligible by law for jury service in federal courts and they should be selected and called to serve without discrimination on account of sex; (4) political affiliation should be ignored; (5) generally speaking, unsolicited requests of persons who seek to have their names placed upon jury lists should be denied and unsolicited recommendations of names should not be recognized; and, (6) in determining the parts of the district from which jurors are to be drawn, the courts should bear in mind the desirability of conserving the time of jurors and preventing exorbitant travel expense to the government."

In its report the same Committee also stated (p. 419 of 26 F.R.D.):

"The jury holds in its collective hands the life, the liberty and the welfare of individual defendants in criminal cases and the interests of litigants

in civil cases. The importance of improving the calibre of these judges of the facts is therefore self evident. At the same time, jurors must be representative of the community in which they live. Therefore, the Committee recommends that the sources from which they are selected should include all social and economic groups in the community and the jury list should represent as high a degree of morality, integrity, intelligence and common sense, as the jury commission can find in each social and economic group by the use of impartial methods of selection.

"To make the selection representative, all groups in the community should be included in the sources from which the list is chosen; women, now everywhere eligible in the United States district courts, should be used; volunteers for jury service should be refused, and economic and social status, including race and color, should not be considered, except to prevent discrimination. * * * "

Prior to 1962 the number of names in the master jury box in the San Antonio Division usually contained between 325 and 500 names. Starting in the latter part of 1962, in order to secure a wider spectrum of the community, a vigorous and continuing effort was made in the San Antonio Division to have at least 2,000 names and preferably more in the master jury box representing a cross-section of the community.

In the San Antonio Division the overwhelming number of names placed in the master jury box are the names appearing on the lists supplied by the suggesters who return the questionnaires sent to them. From time to time the clerk and the jury commissioner send questionnaires to persons presumably eligible for jury service whom they had learned of personally or from others. If the questionnaire reveals that the prospective juror has the statutory qualifications, his or her name is placed in the master jury box alternately by the clerk and jury commissioner. Infrequently the questionnaire will show that the person returning

it is presently physically incapacitated or is a mother with small children and there is no reasonable probability of such person being able to serve. In such instances the name of the person is not placed among the names to be placed in the master jury box. It is plain that if any qualifications additional to the statutory qualifications are added for jury service in this Division they would have to be done by the suggesters in making up their lists. It is the claim of the defendant that the claimed offending paragraph in the form of letter to suggesters in effect informs them that they may add qualifications for jury service above those specified in Section 1861, Title 28 U.S.C.A.

Since the form of letter sent to suggesters in this District is the form in wide use in federal district courts, it is apparent that this portion of the defendant's challenge has a scope far beyond the present case. If that portion of the defendant's challenge is well founded, then hundreds of federal court juries presently or shortly to be impanelled are invalid juries. The other portion of the defendant's challenge relates more particularly to this Division.

In the *Rabinowitz* case, in the majority opinion it was stated that the clerk and jury commissioner whose actions were involved in that case had added on to the statutory qualifications their own ideas of jury qualifications. In the present case it is clear that the clerk and the jury commissioner did not so do. They merely used a form suggested by the Judicial Conference Jury Committee and whatever additional qualifications, if any, would be those added by that Committee by including in its suggested form of letter to suggesters the paragraph complained of. In its report the Jury Committee quoted from the opinion in the case of Thiel v. Southern Pac. Co. (1946), 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 1183. A portion of that quotation was as follows (p. 429 of 26 F.R.D.):

" 'The American tradition of trial by jury, considered in connection with either criminal or civil proceedings,

necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. * * * ' "

It is apparent that the Jury Committee was of the view that its recommendations and suggestions would make for the attaining of the goals set by the United States Supreme Court in the quotation.

The Judicial Conference and its committees play a very important part in the administration of federal courts. Obviously neither the actions of the Judicial Conference nor any of its committees can prevail over the decisions of the authoritative federal appellate courts. It is to be noted that the Jury Committee is still functioning and for some time has been studying or, as one member stated, "struggling" with the problem of jury selection. It might well be that soon that Committee might make a report not in harmony with its previous report and suggest different ways and means for solving the difficult and complex problem of jury selection. It is, of course, well known that Congress has been and is considering legislation relating to the matter of federal jury selection. In 54 American Bar Association Journal, pp. 128–135 (February 1967), there is a discussion by United States Senators Philip A. Hart and Sam J. Ervin, Jr., on proposed Congressional changes in the selection of federal court jurors. It is apparent that the selection of federal court jurors, especially in metropolitan areas, presents a serious and difficult problem to which there is no simple and apt solution.

There is a matter to which reference should be made in order to clarify the nature and scope of the challenge of the defendant under the *Rabinowitz* case. In some quarters at least, it was or is the view that the *Rabinowitz* case "outlawed" the use of suggesters or key men. Counsel for the defendant stated of record that they did not construe the *Rabinowitz* case as outlawing the use of suggesters or key men and that they did not so contend. They further stated that it was their view that what was condemned in that case was the assembling of jury lists from "grossly inadequate sources" and the adding by the clerk and the jury commissioner of their own ideas as to qualifications for jury service which qualifications were beyond those specified by Section 1861. It is of interest to note that in the case of Brooks v. Beto (5th Cir. 1966), 366 F.2d 1, decided by the same Court just nine days after *Rabinowitz*, the use of properly chosen selectors or suggesters was expressly suggested.

In this case it is the contention of the defendant that the paragraph in the letter to suggesters referred to purported to authorize them to set qualifications for jury service beyond those specified by Section 1861, Title 28 U.S.C.A. It is also the contention of the defendant that while it was permissible for the clerk and jury commissioner to make use of suggesters, the use as made by them in connection with the present jury list resulted in that list being assembled from "grossly inadequate sources". That latter contention will be considered after consideration of the defendant's challenge relating to the matter of the claimed additional jury qualifications.

It was heretofore noted that Judge Brown concurred specially. The first four paragraphs of his special concurring opinion are as follows (emphasis added, 366 F.2d, p. 72):

"I concur fully in the result, both as to the reversal of the convictions and the dismissal of the indictments. In order to avoid a 4-to-4 deadlock and the unfortunate predicament of a Court being unable authoritatively to decide a case * * *, I cast my vote, weak as it is, for the thesis developed at such length that Congress *intended* the 1957 Amendments to be,

not the minimum, not the maximum, but the sole standard of jury selection. But having so declared, *I am not at all certain just what is decided.*

"I characterize as 'weak' my concurrence concerning congressional intention—what Congress thought it was doing, not what the law reads into what Congress was bound to think it was doing. I do this because too much is made out of too little. Almost as much as Judge Bell, I think the materials of legislative history are so very, very thin on which to raise such a mighty edifice.

"But accepting this with all of its intrinsic infirmities, I think the Court's opinion is too doctrinaire. For despite the assumed purpose of Congress to make the 1957 Act the sole standard, it is plain to me that this simply could not be.

"There is, first, the command of the Constitution which overrides all. It is true, of course, as the opinion points out, that with respect to Federal juries Congress can prescribe legislative standards more exacting than what the Constitution requires. So, too, may Federal Appellate Courts give voice to such standards in doubtful cases short of statutory violation through the exercise of supervisory power over the conduct of criminal justice. But neither Congress nor the Courts can disregard what the Constitution demands."

The majority opinion has been construed by some as mandating against any discretion or selective judgment on the part of those having to do with the selection of juries beyond that of ascertaining whether they met the qualifications specified in Section 1861, Title 28 U.S.C.A., referred to as the 1957 Act. In discussing the matter of jury selection, Judge Brown in *Rabinowitz* stated (p. 77):

"At every step, therefore, there is a continuing demand for selective judgments. While in making them it may be assumed that as to individuals chosen they are required nominally to have only the qualifications prescribed in the 1957 Act, the fact is otherwise. To those must be added all of the other measuring tests to assure the fair community cross section. This means that whatever Congress might have thought it was doing, it did not, it could not, dispense with these additional judgmental standards by which out of hundreds of thousands, or occasionally a million or more names, the very, very tiny group comprising the box is selected. Judge Bell is most certainly this much right: the selection of a jury box in which all would barely pass the minimum literacy—read-and-write—test would inescapably be constitutionally defective.

"There is a place therefore—indeed, the Constitution assures a place—for levels of intelligence above the marginal minimum literacy test. Thankfully, the Constitution rescues the judicial structure from the ironic assumption that the law cannot search for or try to get the sort of intellectual preparation for deciding today's complex controversies. This is not to disparage the often profound, innate wisdom of illiterates or marginal literates. It is to say, however, that the community of today whose cross section must be found in the jury box is no longer— if it ever were—at the educational or intellectual level of the marginal literates. Nor is the society which law seeks to serve the simple, agrarian, frontier type. With billions of dollars of constitutionally generated public funds and added billions of private contributions being poured annually into our educational system, the aim of which is to produce better citizens for this nation, world and time, it simply defies reason to think that intellectual attainments and formal educational experiences must be totally disregarded as we select these very important public servants. It is also to say that a system which undertakes to require that the only applicable test is the lowest common denominator runs head-on into the Constitution."

In the Jury Committee's form of letter complained of by the defendant herein, the suggesters are first informed that the persons being considered by them for inclusion on their lists must first meet the statutory requirements. They are also informed that they should "make a conscious effort to include both men and women from a variety of backgrounds and occupations so as to give * * * a representative cross-section of your community." They are also informed, as it seems to this Court, that operating within those limits they may put on their lists those who appear to be the better fitted for jury service and in that connection they are reminded that such persons are to be found among those of humble station.

It heretofore appeared that, except for the special concurrence of Judge Brown in Judge Rives' opinion in the *Rabinowitz* case, it would have been a 4-to-4 case. Therefore, it would seem to this Court that the views of Judge Brown as to what scope could be given to the opinion of Judge Rives without encountering constitutional difficulties make his views of significance.

■ It is the view of this Court that the Jury Committee's form of letter under attack does not purport to authorize nor does it authorize impermissible selective judgment and discretion on the part of suggesters.

It is the holding of the Court that the challenge of the defendant based on the claim of additional improper juror qualifications is not well founded.

There is one minor matter which is to be noted. There are in every society those who are regarded as being its dregs. Among those are prostitutes, panderers, thieves, muggers and members of gangs engaged in criminal activities. Many of those would have the qualifications for jury service specified by Section 1861, including the nonconviction of felony provision, since many of them if convicted of any crime at all would in many instances have been convicted only of misdemeanors.

■ The qualification of most vital importance among the statutory qualifications is that of the ability to read, write, speak and understand the English language. That qualification is frequently referred to as the English language qualification. Our modern life gives rise to intricate and complex factual situations in both criminal and civil cases not even dreamed of decades ago. For a person to be deprived of his or her life, liberty or property by jurors who did not adequately understand and comprehend the evidence would obviously be to deprive such person of his or her constitutional right to due process, the very process our jury system is intended to insure.

■ The next challenge of the defendant to the jury panel in this case is that its composition was such as to violate his constitutional right to a jury panel constituting a fair representation of the community. That challenge has two phases. One is that it was not a fair representation of the community in regard to a group referred to by the defendant as Mexican-Americans. The other is that it did not constitute a fair representation of the community from the standpoint of economic attainment and employment. It would seem that what the defendant asserts is as follows: (1) the composition of the present jury panel showed a gross disparity in the matter of cross-section; (2) such disparity was so manifest that it could only be accounted for by the clerk and jury commissioner following a pattern of discriminatory selection or a pattern of failing to make use of adequate sources of information; and (3) that such patterns were disclosed by the jury panel lists for years back. The defendant introduced into evidence jury panel lists extending back into 1964, which lists were on file in the office of the clerk.

The greater part of the evidence and the arguments related to the group referred to by the defendant as Mexican-Americans. It appears that the term Mexican-Americans refers to white persons with Spanish surnames. The term

Mexican-Americans is used interchangeably with the terms Latin Americans and Spanish Americans. Much of the trial time was spent on the question of group identity and inclusion.

The defendant presented a large amount of evidence bearing upon that question. Included in the exhibits offered by him were three documentary exhibits. One was a booklet entitled, "A Statistical Profile Of The Spanish-Surname Population Of Texas" (1964), prepared by the Bureau of Business Research of the University of Texas. For convenience, that booklet will be referred to as the Statistical Profile. Another exhibit was a booklet entitled, "Poverty Among Spanish Americans In Texas: Low-Income Families in a Minority Group," prepared by Texas A & M University. For convenience, that booklet will be referred to as the Texas A & M Report. Another was a booklet entitled, "United States Census of Population 1960—Texas." The exhibits show that the Census Bureau and others engaged in the field of population composition made use of various tests for determining who might be classified as belonging to the group which is termed by the defendant as Mexican-Americans. The test that was and is thought to be the best test for determining who is to be classified as being included in that group is the Spanish surname test. All those having Spanish surnames are classified as being Mexican-Americans. It also appears from some of the exhibits referred to and from the oral testimony that the surname does not in all instances reflect the true situation. Such instances would be the intermarriage of those with Spanish surnames with those of nonSpanish surnames and vice versa. However, it appears from the evidence that those marriages pretty well cancel out. It appears and the Court so finds that there is in Bexar County an identifiable ethnic group referred to as Mexican-Americans, which group must be taken into consideration in connection with jury selection. It appears from some of the exhibits there is resentment on the part of some who have Spanish surnames against their being given the hyphenated classification of Mexican-Americans. It appears from some of the exhibits that in some instances persons who are so classified are members of families who have been residents in what is now the State of Texas as far back as ten generations. This Court emphatically states that the finding of the Court upholding the claim of the defendant as to the existence of an identifiable group known as Mexican-Americans and the use of that term by the Court does not carry with it any unfavorable inferences as to loyalty and allegiance on the part of those so designated. Among other things, the high incidence of Spanish surnames on the casualty lists of the present and past wars effectively negates any such inferences. The frequent occurrence of Spanish surnames among the Viet Nam casualty lists for this area is very noticeable.

In the United States Census Reports there is a classification designated as nonwhite. So far as Texas is concerned, the number of nonwhites who are not Negroes is infinitesimal. Therefore, the word nonwhite as used in Texas census figures is coextensive with the word Negro.

There are three general groups in Bexar County: white persons with Spanish surnames referred to as Mexican-Americans; white persons without Spanish surnames; and Negroes. White persons without Spanish surnames are commonly referred to as Anglos.

The defendant called a number of witnesses. Included in the witnesses called by him were Dr. O. Z. White, who for the past three and one-half years has been a resident of San Antonio and the Chairman of the Department of Sociology of Trinity University of San Antonio, and Dr. William Crane, who for the past nine years has been on the faculty of St. Mary's University, San Antonio, in the political science department. Both witnesses were well informed in their respective fields. From the documentary evidence referred to and from the testi-

mony of Doctors White and Crane, much factual information as to the groups involved was furnished. That information will next be noted.

According to the 1960 Census, in Texas for those over 25 years of age the median of school years completed by Mexican-Americans of Bexar County was 5.7 years; for the Anglos 12 years; and for the Negroes 9.4 years. Doctor White testified that the fairly low median for Mexican-Americans was attributable in a great part to the fact in the past years they had been seriously educationally disadvantaged. He further testified that in more recent years vigorous and effective steps had been taken which had been long overdue which had the effect of and was reducing their educational disadvantages. Doctor White was of the view that at the present time the median level of school years completed in the case of Mexican-Americans had increased to six. This Court is of the view that such is the case. It would also seem that during the same period the median level for Anglos and Negroes would have also gone upward. The median figures above given do not, of course, represent the average. They mean that as to any group one-half would be found above the line and one-half below the line.

It should be noted that the figures given as to years of school completed related to Mexican-Americans over 25 years of age. However, since few between the ages of 21 and 25 would be going back to grade school, the figures would obviously be little different as to all those over 21.

From data assembled by the United State Census Bureau, it is shown that in Texas in 1960 the median annual family income for Mexican-Americans was $3,446; for Anglos $4,137; and for Negroes $1,916.

In the Statistical Profile (p. 19) it is stated: "Proportionately, the Spanish-surname group in 1960 had almost 50 percent more persons in the young age category than did the Anglo population." In the Statistical Profile (p. 26) it is stated: "Of the Spanish-surname families, 26.8 percent record four or more children under 18 * * *." It also there stated that the comparable figure for the Anglo group is 7.9.

In the Statistical Profile (p. 26) it is stated that the fertility rate of the Spanish-surname population is very high. It is there also stated: "Indeed, in comparison with other national groups, it is possible that only some small Indian populations on reservations in the western states have fertility rates higher than that for the Spanish-surname population."

The young age group above referred to consists of children up to 14 years of age. It is to be noted that the number of Spanish surname families having four or more children under 18 years of age is three times greater than the number of such families in the Anglo group. It is also to be noted that in the Statistical Profile (p. 27) statistics are set forth which show that 42.2 percent of the Anglo families have no children under 18 years of age while only 26.9 percent of the Spanish surname families have no children under 18 years of age. According to the 1960 census reports, 44 percent of the population in the metropolitan areas of Texas are under 21 years of age.

According to the 1960 census, among the counties in Texas Bexar County had the heaviest concentration of Mexican-Americans—257,090. There was no county in the state that came close to that figure, the nearest being El Paso County with 136,993. Only four counties in the state have in excess of 75,000. It was heretofore noted that according to recent census estimates the total population of Bexar County is 836,363. According to the same estimates 36 percent of the population, or 301,091, are Mexican-Americans. As heretofore noted, the defendant places great stress on the figure of 36 percent.

The statistics of the Naturalization Department show that in 1965, 27,295 registered as aliens permanently residing in Bexar County, of which 23,653 gave

Mexico as the country of their national origin and 3,642 gave other countries as the countries of their national origin. Since there are few aliens in the Negro group, those 3,642 would be in the Anglo group.

It appears from the record that Bexar County is a bilingual county with a very heavy concentration of Mexican-Americans. There are radio stations and a television station using the Spanish language exclusively. Advertisements are run both in Spanish and English. The business places are, in general, staffed with bilingual staffs. The court language situation has been such that the judges of this District have asked the Judicial Conference of the United States to provide a full-time interpreter for use in trials at San Antonio.

A witness called by the defendant made an analysis of the present jury panel. He will be referred to as the defendant's analyst. In connection with his analysis, it was necessary for the analyst to make identification of Spanish surnames. It appears that it is not always easy to make an identification of a particular name as to its being or not being a Spanish surname. In some cases the surname may appear to be one that could be either Spanish or nonSpanish. Changes in the spelling of a Spanish surname or Anglicization of it, even though only slight, could make for difficulty in the matter of identification. However, the Court is of the view that the analyst correctly identified the Spanish surnames on the list. The analyst identified eight names on the list as being Spanish surnames. He identified five of those names among the names of the jurors from Bexar County. There were 45 jurors listed from Bexar County. The attack of the defendant as to this phase is bottomed upon the claim that Mexican-Americans constituted 36 percent of the population and that with only five names of Mexican-Americans appearing in the list of jurors from Bexar County the list showed on its face such a gross disparity as to condemn it. The defendant, as heretofore noted, confines his attack on this phase to Bexar Coun-

ty. It is to be noted that in the nonmetropolitan counties in this Division there were, according to the census reports, some counties which had substantial Mexican-American minorities while others had very few. In connection with the present panel, it is of interest to note that in the nonmetropolitan county of Medina the Mexican-American representation was 50 percent (1 out of 2) and that in the nonmetropolitan county of Comal the Mexican-American representation was 33⅓ percent (1 out of 3). In both instances the Mexican-Americans were grossly overrepresented as against the Anglos. However, those figures illustrate the apparent distortions likely to appear in the drawing of a limited number of names from a jury box which at best can only contain a minute portion of the names of the entire population. The Mexican-American names appearing on the jury panel listed as coming from Bexar County constituted 5 out of 45, or 11 percent of the jurors from that county. Against the figure of 11 percent, the defendant places the census figures showing that the Mexican-American group in Bexar County constitute 36 percent of the population and contends that the figures on their face show such gross disparity as to invalidate the panel. However, the other figures heretofore set out are of pertinence in connection with the selection of prospective jurors.

■■ It is plain that under the provisions of Section 1861, Title 28 U.S.C.A., all persons in the community from which jurors are to be selected who have the qualifications specified in that Section constitute the community statutorily qualified jury pool. Those having to do with jury selection are restricted to selecting jurors from that pool. Therefore, they cannot select aliens, minors or those who cannot read, write, speak and understand the English language. It seems clear that in the matter of proper representation of a certain identifiable group consideration has to be given to the number of that group who are presumably eligible for inclusion in the community statutorily qualified jury

pool. For instance, if an identifiable group comprises 50 percent of the population of the community but only 10 percent of that group are eligible for inclusion in the community statutorily qualified jury pool and the other group or groups constituting 50 percent of the population of the community had 50 percent of its members eligible for inclusion in the community statutorily qualified jury pool, it could hardly be successfully maintained that the first group would be entitled to have one-half of the jurors drawn from its eligibles. If that were done, the other group or groups would be penalized and discriminated against solely and only because of the presence among them of more who could meet the statutory qualifications for jury service. Discrimination as to those who are statutorily qualified for federal court jury service is just what Congress and the courts are seeking to prevent. The United States Supreme Court recently decided the case of Whitus v. State of Georgia (January 23, 1967), 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599. The case involved a Georgia state court conviction of a Negro in which it was claimed by the defendant that Negroes had been discriminated against in the selection of the grand and petit juries involved. Under the Georgia statutes, those whose names appeared on the tax receivers' lists were eligible for jury service. The Court in that case found that there was disparity. The disparity was based on the difference in percentages between the Negroes eligible for jury service and those serving on the juries. In the same case the Court made use of the census figures showing the number of persons over 21 years of age.

In the majority opinion in the *Rabinowitz* case (p. 55), those in a community meeting the statutory qualifications for jury service prescribed by Congress are said to constitute the "statutorily qualified pool".

In the case of Labat v. Bennett (5th Cir. 1966), 365 F.2d 698, petition for certiorari filed January 10, 1967, use was made of figures showing the percentages of Negroes eligible for service as contrasted with the white group. Therefore, it seems clear from the cases just referred to that in passing upon the matter of discrimination as to a certain group or groups the number of such group or groups presently eligible for jury service must be considered.

There will next be considered what the evidence shows as to what percentage of the Mexican-American, Anglo and Negro groups are eligible for inclusion in the community statutorily qualified jury pool. There is first to be considered the number of those in those groups who can presumably meet the English language qualification prescribed by Section 1861. That Section sets up no standard for determining who shall be deemed to have the ability to read, write, speak and understand the English language. It was heretofore noted that from the evidence adduced in behalf of the defendant those who work in the fields in which the ability to read, write, speak and understand the English language is of pertinence, in general, made use of what is termed the years of school completed standard. Under that standard a person who has completed five years of school presumably has that ability and those who have not so done presumably do not have that ability. That is the standard proposed by the defendant.

It is to be noted that the years of school completed standard is presumptive rather than absolute in character. A particular person being considered for jury service might well meet the English language qualification even though he or she had not completed any years of schooling or had completed less than five years of schooling. It is of interest to note that Section 1973b(e) (2), Title 42 U.S.C.A. of the 1965 Voting Rights Act relating to the voting rights of those of Puerto Rican background, provides that the successful completion of the "sixth primary grade," is to be regarded as being presumptive of literacy.

It was heretofore noted that the median of years of school completed in the case of Mexican-Americans over 21 years

of age had now increased to six years. It is to be noted that in the majority opinion in *Rabinowitz* it was suggested that six years of school completed might be considered as a standard in the matter of ability to read, write, speak and understand the English language. It would seem that in view of the growing complexity of jury cases the slightly higher standard of six years might be more in accord with the needs. However, computations will be made using both standards. If the six-year standard is used, 50 percent of the Mexican-Americans over 21 years of age would not meet the English language requirement. If the five-year standard is used, 41.6 percent of the Mexican-Americans over 21 years of age would not meet that requirement.

There is next to be considered the number of minors in each group. In the case of Whitus v. State of Georgia, supra, the United States Supreme Court in connection with the matter of jury discrimination made use of such figure. Obviously the greater number of minors there is in a particular identifiable group the lesser is the number of that group who would be eligible for inclusion in the community statutorily qualified jury pool. It is also obvious that the higher the fertility rate is in a particular identifiable group the greater will be the number thereof who will be under 21 years of age.

The census figures for 1960 show that in urban areas in Texas those under 21 years of age constituted 43.9 or approximately 44 percent of the population. The figures as to the fertility rate of the Mexican-American group as contrasted with the Anglo and Negro groups, which were heretofore noted, show that the Mexican-American group has a disproportionate number of those under 21 years of age. Using the most conservative of those figures, it appears that proportionately the Mexican-American group has 50 percent more children under 21 years of age than do the other groups. The basic data and the calculations as based on that data are next set forth:

## DETERMINATION OF PERCENTAGE OF MEXICAN-AMERICANS AMONG CITIZENS OF BEXAR COUNTY WHO ARE ELIGIBLE FOR FEDERAL COURT JURY SERVICE

A. Basic Data

(1) Population of Bexar County .......................... 836,363

(2) Percentage division of population:
   Mexican-American ....................... 36%
   Negro .................................. 6%
   Anglo .................................. 58%

(3) Aliens in population:
   Mexican-American ............................... 23,653
   Anglo ........................................... 3,642

(4) Age distribution:
   44% of total county population aged under 21
   Mexican-American group has 50% more population under 21 than does Anglo-Negro group
   Hence: 56.4% of Mexican-American group under 21 and 37.6% of Anglo and Negro groups under 21

(5) Literacy standard:
   (a) 6 years of school completed and alternatively
   (b) 5 years of school completed

(6) Literacy percentage:
Negligible % of nonliteracy in Negro and Anglo groups

Median school years completed by Mexican-Americans over 21: 6

    (a) With a literacy standard of 6 completed school years, 50% of Mexican-Americans over 21 would be eligible for jury panel

    (b) If standard is 5 completed years, 58.3% would be eligible

B. Calculations:

(1) Citizens of Bexar County by groups:

| | | Total Populations | Aliens | Citizens |
|---|---|---|---|---|
| Mexican-American | 36% ...... | 301,091 | 23,653 | 277,438 |
| Negro | 6% ...... | 50,182 | – | 50,182 |
| Anglo | 58% ...... | 485,090 | 3,642 | 481,448 |
| Total | 100% | 836,363 | 27,295 | 809,068 |

(2) Modification for population under 21:
Mexican-Americans aged

| | 21 or over: | 43.6% x 277,438 = | 120,963 |
|---|---|---|---|
| Negroes aged | " " " | 62.4% x 50,182 = | 31,314 |
| Anglos aged | " " " | 62.4% x 481,448 = | 300,424 |
| Total | ..................................| | 452,701 |

(3) Modification for nonliteracy:

    (a) With a 6 completed school years' standard

| | | | % Total |
|---|---|---|---|
| Mexican-American .......... | 120,963 x 50% = | 60,482 | 15.4% |
| Negro ..................... | 31,314 x 100% = | 31,314 | 8.0 |
| Anglo ..................... | 300,424 x 100% = | 300,424 | 76.6 |
| Total ..................... | | 392,220 | 100.0% |

    (b) With a 5 completed school years' standard

| | | | |
|---|---|---|---|
| Mexican-American .......... | 120,963 x 58.3% = | 70,521 | 17.5% |
| Negro ..................... | 31,314 x 100 % = | 31,314 | 7.8 |
| Anglo ..................... | 300,424 x 100 % = | 300,424 | 74.7 |
| Total ..................... | | 402,259 | 100.0% |

It will be seen that using the five-year school standard Mexican-Americans constitute 17.5 percent of the community statutorily qualified jury pool; Negroes constitute 7.8 percent of that pool; and the Anglos 74.7 percent of that pool; and that using the six-year standard the figures would be 15.4 percent for the

Mexican-Americans; 8.0 percent for the Negroes; and 76.6 percent for the Anglos.

In the recent case of Swain v. State of Alabama (1964), 380 U.S. 202, pp. 208, 209, 85 S.Ct. 824, p. 829, 13 L.Ed.2d 759, the Court stated: "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." On the present jury panel 11 percent of the jurors from Bexar County were Mexican-Americans. If the six-year school standard is used, the variance between that percent and the percent eligible would be 4.4 percent. If the five-year school standard is used, the variance would be 6.5 percent. In the case of Swain v. State of Alabama, supra, the Court stated (p. 205 of 380 U.S., p. 827 of 85 S.Ct.): "But purposeful discrimination may not be assumed or merely asserted."

■ It is the view and holding of the Court that the difference between 11 percent and 15.4 percent and/or 17.5 percent does not constitute such a disparity as to indicate discrimination as to Mexican-Americans.

■ The defendant introduced into evidence lists of jury panels extending back into 1964 which showed a much greater disparity. It is well settled that if in the case of a particular jury panel serious disparity appears resort may be had to previous jury panel lists as a means of showing that a pattern of discrimination was being followed. Since the present jury panel under attack shows no such disparity, earlier jury panel lists need not be resorted to. There is not any evidence that a number of persons with Spanish surnames were specially placed on the present jury panel. However, a review of the general system of jury selection in this Division which is of pertinence in another connection would seem to throw some light on the lack of disparity in the matter of Spanish surnames on the present panel as compared with jury panel lists for previous periods. In the present case those having to do with jury selection were confronted with the problem of jury selection in a metropolitan area.

Those having to do with the selection of juries in metropolitan areas face problems not encountered by those having to do with the selection of juries in non-urban communities. In the latter communities most people know most of the other people. Migration in and out of the community is usually not substantial and the occupations, vocations and activities of the members of those communities follow simple broad patterns. That situation does not exist in metropolitan areas. One of the well-known features of metropolitan life is that of anonymity. In metropolitan areas persons who for years have lived in certain locations are strangers to those living at or near those locations. Another well-known feature of metropolitan life is that of mobility. There is continual movement in and out of the area and within the area. In metropolitan areas there is fractionalization of the economy into thousands of occupations and activities.

It was heretofore noted in the latter part of 1962 it became the objective of the Chief Judge of this District to have the names in the master jury box increased from between 325 and 400 to 2,000 or more in order to provide a broader spectrum of the community. In the latter part of 1964 the Chief Judge of this District secured the services of Doctor Max Johnson as jury commissioner. Doctor Johnson was a physician engaged in general practice in a downtown office in San Antonio who had been so engaged for around 40 years. He had a very wide general practice which included persons from all groups. He had a very substantial practice among Mexican-Americans and Negroes. He has and has had a wide knowledge of the community. Doctor Johnson at the time he accepted the appointment as jury commissioner was planning on retiring from the practice of medicine and in 1965 he did so do. While he was still in practice, he put in considerable time contacting many people

and organizations for the purpose of securing lists of names of qualified jurors. Since his retirement he has put in nearly full time on the securing of such names. It is known that jury commissioners receive only pittances as compensation. The record discloses a splendid example of dedicated public service on the part of Doctor Johnson. The clerk also put in much time in securing lists of qualified jurors. The clerk has been a resident of the community for over 45 years and has been clerk for over 30 years. He has and has had a wide knowledge of the community. The securing of such a list of names in a metropolitan area is slow, tedious and at times almost frustrating work that cannot be accomplished in just a few weeks or even a few months. In this Division the frequent calls for jury panels make a heavy drain on the names in the master jury box and the continuing need of substantial replenishment. This makes for somewhat slow progress in increasing the number of names in the master jury box to 2,000 and over.

In this Division the clerk and commissioner have been making use of 500 or more suggesters covering a broad spectrum of the population who have provided names of persons, over 5,000 of whom have returned the questionnaires sent to them.

Doctor Johnson invited into his home a number of leaders in the Mexican-American and Negro groups and secured the names of prospective suggesters and names of prospective jurors. He also contacted other persons in those groups. He received much assistance from those whose assistance was sought. An organization known as the League of United Latin American Citizens, a very large Mexican-American organization, was contacted. He also contacted the Mexican Chamber of Commerce as well as the Negro Chamber of Commerce. Among those he contacted was a Mexican-American who was the holder of an elective office in the City of San Antonio and another who had held a similar office. One of those alone furnished between 40 and 50 names of Mexican-Americans eligible for jury service. However, the efforts of the clerk and jury commissioner to secure the names of those qualified for jury service were not confined to the securing of the names of Mexican-Americans and Negroes qualified for jury service.

Efforts were made to secure the names of those of high economic status, low economic status and middle economic status. The A.F.L.-C.I.O. was contacted. Efforts were made to secure the lists of qualified persons in various work groups, skill groups and other working groups. The problem was encountered in some instances of those whose names were suggested who did not return the questionnaires sent them.

It appears that the strenuous and continued efforts of the clerk and jury commissioner, at least so far as Mexican-Americans and Negroes are concerned, are favorably reflected in the present jury panel.

The last part of the defendant's challenge is that the present jury panel did not represent a fair cross-section of the community in the matter of economic attainment and employment. That contention brings up for consideration a number of matters.

In the case of Labat v. Bennett, supra (365 F.2d p. 711), there appears the following quotation: " 'The very idea of a jury', the Supreme Court has said, 'is a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; * * * ' ". In the same case it was stated (p. 724) that the effect of the exclusion in that case "was to deprive the defendants of a jury of their economic and social peers." That rule leads to a number of problems and questions when considered in connection with the cross-section rule. For instance, a physician in operating his automobile injures a pedestrian who is a day laborer. The latter sues the former for his injuries. Under the doctrine stated, both parties would appear to have the right to have a jury composed of their peers. The

question suggests itself—Who gets whose peers? Manifestly, the rule should be available to the defendant as well as the plaintiff and vice versa. The question suggests itself as to who are the peers where a corporation, a trust or other similar entity is a party to the litigation or the litigation is between two of. such entities.

■ The situation in the present case brings one phase of the matter into sharper focus. It was stated of record in behalf of the defendant that he is neither a Negro nor a Mexican-American. Therefore, he is a member of the Anglo group. The evidence shows that the defendant is a member of the legal profession. His first contention which was heretofore discussed was that as to the present jury panel disparity was shown by the greater number of Anglos as compared to Mexican-Americans. His other contention which is presently under consideration is that as to the present jury panel discrimination is shown by the claimed presence on the jury panel of a large number of members of professional and other groups of presumably high economic attainment as contrasted with members of groups of lower economic attainment. The members of the former groups would seem to approximate what would usually be regarded as the defendant's economic and social peers.

It is well settled that a party may challenge the validity of a jury panel under the cross-section rule even though no apparent prejudice to him appears because of the nonobservance of that rule. Therefore, it would seem that the so-called peers rule has, in practical effect, been pretty well eroded by the cross-section rule. Under that latter rule, where a jury panel is under attack the focus is upon the question as to whether it represents a fair cross-section of the community and not upon the question of how many peers of the attacking party may or may not be on the jury panel. It is clear that the defendant has the standing to attack the validity of the present jury panel.

The last portion of the defendant's attack heretofore referred to will be next. considered. That attack is based on the claim that the present jury panel manifests such a discrimination from the standpoint of economic attainment and employment as to invalidate the panel under the cross-section rule. The cases of Thiel v. Southern Pacific Co. (1946), 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 1183, and Labat v. Bennett (5th Cir. 1966), 365 F.2d 698, petition for certiorari filed January 10, 1967, are the leading cases on the portion of the defendant's attack just noted. In both cases there had been a wholesale, deliberate exclusion of what were termed daily wage earners from the jury lists involved in those cases. In the latter case such exclusion tied in with the exclusion of Negroes. Neither of those features is present in the instant case.

There was not any evidence as to the amount of property owned by the different members of the present jury panel. Manifestly, it would be questionable to attempt to call in all the members of a jury panel either before or after trial and examine each as to his or her financial circumstances. Therefore, their economic attainments, whether low, medium or high, have to be gleaned from the occupations listed by them and the situation is the same as to the nature of the work and duties performed by them. Therefore, the height of their economic attainments and the nature of the work and duties performed by them has to be inferred from the economic attainments usually attended by those in the same or similar occupations. The situation would be the same as to the nature of the work and duties performed by them.

There are a number of matters which give rise to some difficulty and problems in connection with inferences drawn from occupational listings. In an earlier and more simple economy, classifications as to economic attainments and the nature of employment were few, broad and simple such as farmers, merchants, those employed by the day, those employed on salaries by business institu-

197

tions, a limited number of those engaged in providing services such as black-smithing and other repairing, and a limited number of those engaged in the medical and legal professions. Those performing specialized services or services of a technical nature were largely unknown.

There are a number of developments that would seem to be of pertinence. In more recent decades the business of the country has become service oriented. The overwhelming number of the people gainfully employed are in businesses which are engaged in the rendering of services as contrasted with those engaged in the production of goods and products. Under modern conditions, by the use of automation and related techniques, a comparatively few can produce an almost fantastic amount of goods and products. Modern technical and industrial developments have made for an increased number of skills and especially high skills. Manual unskilled labor has been displaced in an ever increasing number by machines. It appears that manual unskilled labor, although it still exists in certain areas, is in the process of being phased out wherever possible because of its high economic cost.

Technical and scientific developments and the great extension of our country into a service-oriented economy has made for thousands of occupations not known even a few years ago. In the Dictionary of Occupational Titles published by the United States Department of Labor, there are 21,000 different job listings together with 14,000 alternative job listings. Probably several thousands of those job listings would be present in the job listings for Bexar County. Counsel for the Government assert that in the jury panel lists introduced into evidence by the defendant 325 different occupations were listed.

The United States Supreme Court has repeatedly repudiated the theory that members of different races or different occupations are to be included in jury panels in accord with exact percentages. In the case of Swain v. State of Alabama,

supra, the Court stated (p. 208 of 380 U.S., p. 829 of 85 S.Ct., 13 L.Ed.2d 759): "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." The Court in the same case further stated (p. 209 of 380 U.S., p. 830 of 85 S.Ct.): "Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race."

In view of the minute number of persons on any jury panel as compared with the total number of persons in a community eligible for jury service and in view of the wide proliferation of occupations, it would be expecting the impossible to expect that any particular jury panel would "accurately reflect" the number of persons in the community engaged in a particular occupation or group of occupations. Under the doctrine of Swain v. State of Alabama, supra, discrimination in that regard is not to be presumed or regarded as being established by mere assertion.

There are some features which make for difficulty in connection with using occupational listings for identification purposes in connection with the matter of economic attainment and the nature of the work. One who works as a manual unskilled day laborer may describe his occupation as "construction" or "construction work" or that of being an employee of a certain named company or institution. Where there are a large number of civil service workers in an area as is the case in Bexar County, many jurors list their occupation as "Civil Service". Civil Service employees perform a multitude of services ranging from largely manual to the very highly skilled services.

It seems to be a tendency in many instances for persons in describing or listing their occupations to use accepted titles or descriptions which tend to upgrade their work. Because of this fea-

198

ture and because of the flexibility in the matter of occupational descriptions, it is probable that many lists containing occupational descriptions furnished by the persons listed would show a paucity of those describing their occupation as laborer or day laborer.

■ In considering the matter of discrimination in the matter of jury selection in regard to the matter of economic attainment and employment, consideration has to be given to the particular county involved.

The evidence of the defendant brought out that the big business in Bexar County is connected with the military. There are numerous references in the evidence to that feature. This feature is occasioned by the location in and around that county of many large and complex military installations and related installations with vast numbers of military personnel and their families. The providing of services to the military installations requires a large number of civilian employees who are classified as being in the Civil Service. The presence of vast numbers of military personnel and their families also makes for a great demand for services of different kinds. The evidence of the defendant showed that San Antonio is a shopping center for many residents of Mexico.

It seems clear that the major sector of the economy of Bexar County is related to the rendering of services rather than the production of goods and products.

There will next be considered the matter as to what inferences might be drawn as to the economic attainments and nature of employment of the members of the jury panel from the information contained on the jury panel list relating to their occupations. The number of jurors on the panel from Bexar County, as heretofore noted, was 45. The defendant's analyst made an analysis of the economic attainments and nature of employment of the members of the present jury panel from Bexar County based upon inferences drawn by him from the information contained on the jury lists relating to occupations. He assigned various members of the panel to various groups. He was examined at great length as to that analysis.

Six of the jurors are listed as housewives and retired and nothing is indicated as to their economic attainments or nature of employment. In some instances it is not clear just what inferences might be drawn. For instance, five of the jurors are listed simply as "Civil Service". Nothing is indicated as to the nature of their work. It was heretofore noted that the military requires the services of a large number of Civil Service workers. Their work ranges from work which is manual in character to work that calls for a very high degree of skill and learning. As heretofore noted, the Civil Service workers constitute a substantial part of those gainfully employed in the community. It was the view of the defendant's analyst that the Civil Service group would be strongly weighted in favor of work classified by him as clerical and operative. It is to be noted that the Civil Service workers constituted 11 percent of the jury panel, which would seem to be a fair representation. There were two jurors from Bexar County who listed their occupation simply as "Banker". There is nothing to indicate whether the two jurors referred to were in work which would be classified as clerical in nature or managerial in character. The defendant's analyst apparently assigned them to the management group.

The defendant's analyst was of the view that the jury panel was overloaded as to the professional and managerial group. His analysis was based on the Bexar County group. There are 4 jurors listed who would seem to fit into the professional classification. There is one listed as a "Civil Engineer". He has a Spanish surname. There is another listed simply as "Engineer". There is another listed as an "Accountant". There is another given as "Accounting & Income Tax". It would appear that those four would be properly classified as belonging to the professional group.

The matter as to whether the listed occupation of a particular juror would or would not give rise to the inference that he had to do with management is not free from difficulty. It is the view of the Court that in twelve instances the occupation listed would properly permit the inference that the juror had to do with management. One of those so indicated had a Spanish surname.

It was the testimony of the defendant's analyst that according to the census figures for the State of Texas as a whole it would be expected that 14.5 percent of the Anglo population of Bexar County would be in the managerial group. Deducting the name of the juror with the Spanish surname would leave eleven jurors in the managerial classification. The eleven Anglo jurors from Bexar County in the managerial group would constitute 15½ percent of the members of the jury panel. That would not be disproportionate.

It would seem that in a highly service-oriented economy such as exists in Bexar County it would make for a much greater proportion of persons in the managerial group than would be the case in a community or communities whose economy is geared to industrial mass production.

The defendant's analyst was of the view that the present jury panel was as to the Bexar County group lacking in proper representation of those groups classified by him as craftsmen, operatives and service workers. On cross-examination he testified as follows:

"Q   Now, what is a craftsman in your classification?

"A   A person who has a trade and follows it, like a shoemaker or technical man who works in the oil field or somebody of this type.

"Q   Now, what is an operative?

"A   An operative is a man who operates a piece of machinery. It is considered one of the lower socioeconomic stratas, like operating a sweeper or truck or—

"  *   *   *

"Q   Now, what is a service worker?

"A   Service worker is a person who deals in services such as a shoe shine man or a service station attendant."

The same witness gave as further examples of craftsmen an auto mechanic and a tool and dye maker.

Based on a classification made by his analyst, the defendant contends that the present jury panel as to the Bexar County group represents a serious lack of those classified as a craftsman. The word "Craftsman" is an old word. It is a broad, general word having numerous meanings. For instance, some dictionaries define the word as including writers and artists. In an older and more simple economy where skills were few in number, it undoubtedly fairly well defined those with certain skills. Our modern economic age has given rise to thousands of occupations and a wide proliferation of skills. Therefore, it is a matter of considerable difficulty ascertaining what skills can be said to be those of a craftsman. As heretofore noted, the defendant's analyst testified that according to his classification a craftsman was one who works at a trade such as a shoemaker or as a technical man who works in the oil field. A shoemaker would presumably be self-employed and possess a moderate amount of skill. A technical worker in an oil field would presumably be a highly trained person and much skilled person employed on a salary by an oil company. A tool and dye maker would presumably be a very highly skilled person employed at a high hourly wage rate by a factory engaged in the fabrication of metals or related products. An auto mechanic would presumably be a person of lesser skill than a tool and dye maker and employed at a somewhat lower hourly wage rate. From those examples, it would seem that the

word "Craftsman" as used by the defendant's analyst for classification purposes would include a person with moderate skill who was self-employed; a highly trained person employed on a salary basis; and a person with rather high skill employed on a hourly wage basis. There are many listed occupations on the present jury panel list other than those referred to which would require either moderately skilled, highly skilled or highly trained workers. One juror lists his occupation as "Telephone Company". Another lists his occupation as "Heating & Air Conditioning". Another lists his occupation as "Mechanic". Another lists his occupation as "Head Waiter". Another lists his occupation as "Band Leader". Another lists his occupation as "City Public Serv. Board". It might also be that among those who listed their occupation as "Civil Service" might be engaged in work requiring high skill or special skill.

It is to be noted that some of those classified by the defendant's analyst as craftsmen would presumably be compensated on an hourly basis and some on a weekly or monthly basis and some self-employed.

In view of the increased skills required by our modern economy and as a result of the impact of strong collective bargaining power on wage scales, the situation is that in numerous cases those whose compensations are based on an hourly basis and receive what are designated as wages have greater economic returns than do those who are compensated on a weekly or monthly basis and receive what are designated as salaries. The distinction between wages and salaries has tended to be blurred by the overtime provisions of the Fair Labor Standards Act. Sections 201 et seq., 29 U.S.C.A., which as to those within the coverage of the Act, require that their compensation be equated to an hourly basis even though designated as salaries.

Considering the classification of craftsmen in light of the examples given by the defendant's analyst, and in light of the numerous occupations listed on the jury panel which might encompass skill or skills of the nature the defendant's analyst apparently had in mind, it cannot be said that it appears with any reasonable degree of certainty that persons having such skills were discriminated against.

Based on the computations made of the members of the jury panel by his analyst, the defendant further contends that a serious disproportion is manifested as to those classified by that analyst as "operatives". That analyst described an operative as one who operates a piece of machinery like a sweeper or truck. He further described an operative as being in the lower economic strata. He further testified that it would be expected that 21.8 percent of the Mexican-Americans in Bexar County would be in that lower strata. It would seem that from the economic strata classification given, the nature of employment that the analyst had in mind was employment in which use was made of those who were unskilled or lowly skilled. Another witness for the defendant testified that in addition to the Mexican-Americans having been educationally disadvantaged they had been and were being seriously economically disadvantaged. He further testified, in substance, that because of those features an unusually high proportion of adult Mexican-Americans were concentrated in employment calling for either unskilled labor or low skilled labor.

It is probable that some Negroes and some Anglos are similarly employed, but it would appear that the overwhelming number of those so employed are Mexican-Americans.

It was heretofore noted that a very high percent of the Mexican-Americans were lacking in the English language qualification for jury duty. It would seem that such Mexican-Americans would tend to be concentrated in the type of employment referred to. Therefore, it is probable that the many Mexican-Amer-

ican suggesters were, because of the features referred to, somewhat limited in the number of names they could list from the group referred to. In view of the strenuous efforts made to secure the names of Mexican-Americans qualified for jury service, it is possible that the names of some in that group who were qualified for jury service were turned in but in such a limited number compared to the names of Mexican-Americans engaged in other activities that none of them happened to be drawn for service on the present jury panel.

It cannot be said with any reasonable degree of certainty that persons classified by the defendant's analyst as operatives were discriminated against.

The defendant's analyst was of the view that the group classified by him as the clerical and sales group was overrepresented on the present jury panel. He apparently assigned all the Civil Service workers to that group. Because of the lack of adequate information and the great flexibility in the matter of making assignments to that group, it is somewhat difficult to say with certainty just how many of the present jury panel actually belong in that group; but it is apparent that there are quite a number on the jury panel who would properly be assignable to that group. However, it clearly appears that Bexar County has a highly service-oriented economy and that such an economy tends towards a comparatively high concentration of workers in the clerical and sales area. It cannot be said that a serious disproportion as to clerical and sales workers appears on the present jury panel. Clerical and sales work is not usually regarded as being synonymous with high economic attainment. Those engaged in that work are usually regarded as being in the middle income group or even low income group.

It was heretofore noted that the number of persons in the Bexar County community statutorily qualified jury pool numbered 402,204. There were 45 persons from Bexar County on the present jury panel. They constituted approximately eleven thousandths of one percent of that pool. The capsulizing of a representative cross-section of 402,204 persons into a jury capsule of eleven thousandths of one percent size is not free from difficulty. It is to be noted that if all of the 2,000 names in the master jury box were names of persons from Bexar County, which was not the case, the total number of those names would have constituted only one-half of one percent of the community statutorily qualified jury pool.

There is one observation to be made as to the situation in Bexar County. It appears, as heretofore noted, that the county has approximately 400,000 in its community statutorily qualified jury pool. It further appears, as heretofore noted, that the voter registration list of the county contains approximately 200,000 names. If the voter registration list were to be exclusively used for the selection of juries, approximately 200,000 in the community statutorily qualified jury pool would be excluded. If the 200,000 referred to are not to be ignored for cross-section purposes, it would seem that because of the size of the group it would apparently be necessary to supplement the voter registration list with several hundred suggesters.

It is possible that the number of those in the federal community statutorily qualified jury pool who are not on the voter registration list is greater than the 200,000 indicated. In Texas there is no literacy qualification for voting. See V.A.T.S. Election Code, Sec. 501 et seq. The figure of 200,000 is based upon the assumption that all persons on the voter registration list would meet federal jury qualifications, which is manifestly not the situation since illiterates are included in that list.

There is one other observation to be made. The San Antonio Division contains fourteen counties. The Division is treated as a unit for jury selection. The names of jurors for all of the counties in the Division are intermingled in a master jury box. In connection with the cross-section rule, the word "community" is used. Where jurors are se-

lected from a number of counties, the question might well present itself as to whether for cross-section purposes all the counties are to be considered as constituting the community or whether each county or several of the counties are to be regarded as constituting a community for cross-section purposes. In the present case no analysis was made which treated the entire Division as the community, and Bexar County was considered by the defendant as constituting the community for cross-section purposes and was so treated by the Court. It could be that in this Division and other similar Divisions the question as to what is to be regarded as the community for cross-section purposes could be of significance in certain instances.

On the present jury panel 33 different identifiable occupations or vocations are shown covering a wide and broad range of activities. There were many representatives of groups usually regarded as being in the lower income and middle income groups. Negroes, who are most frequently discriminated against in the matter of jury selection, were overrepresented. The Mexican-Americans, a group sometimes similarly discriminated against, were fairly represented.

It is the holding of the Court that none of the challenges of the defendant to the present jury panel is well founded.

It clearly appears that seldom has such a vigorous, determined and widespread effort been made to have the jury lists represent a broad spectrum of the community and a fair cross-section thereof as has been made in the San Antonio Division.

It is hereby ordered that the motion of the defendant to quash the jury panel in this case be and the same is hereby denied.[1]

---

1. As the foregoing was about to be filed, there came to the attention of the Court the opinion in the recent, but as yet unreported, case of United States v. Duke (D.C.S.D.Indiana, Chief Judge Steckler, 1967), 263 F.Supp. 828. The Southern District of Indiana makes use of the Judicial Conference Jury Committee's recommended procedures and suggested forms. In the case referred to, that system was under attack. The Court held that the use of the suggester system for federal jury selection was not illegal in design, execution or results. In the opinion in that case there is an extended discussion of the *Rabinowitz* case.