UNITED STATES of America,
Appellant,

v.

William Lloyd BARNARD, John W. Dailey, Charles W. Humphrey, Donald Henry Smalligan, Peter John Smedes and Roy Henry Stout, Appellees.

UNITED STATES of America,
Appellant,

v.

John W. DAILEY, Robert E. Lukens, and James F. Bogue, Appellees.

UNITED STATES of America,
Appellant,

v.

William Lloyd BARNARD, Walton H. Morse, and Homer A. Kelley, Appellees.

UNITED STATES of America,
Appellant,

v.

Donald Henry SMALLIGAN, Peter John Smedes, and William Lloyd Barnard, Appellees.

Nos. 5786–5789.

United States Court of Appeals
Tenth Circuit.

May 2, 1958.

Rehearing Denied May 23, 1958.

Milton P. Beach, Asst. U. S. Atty., Kansas City, Kan. (William C. Farmer, U. S. Atty., Topeka, Kan., was with him on the brief), for appellant.

J. A. Dickinson, Topeka, Kan., and Patrick J. Warnick, Wichita, Kan. (David Prager, William W. Dimmitt, Jr., Sam A. Crow, Topeka, Kan., Donald C. Little, Kansas City, Kan., Alvin C. Randall, Edwin Earnshaw, Roscoe C. Van Valkenburgh, James E. Lockwood, Kansas City, Mo., Arn & Mullins, Wichita, Kan., and Joseph H. McDowell, Kansas City, Kan., were with them on the brief), for appellees.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

BRATTON, Chief Judge.

These four criminal cases present for determination questions of law common to all of them and therefore the cases may be considered together.

In the first case, William Lloyd Barnard, John W. Dailey, Charles W. Humphrey, Donald Henry Smalligan, Peter John Smedes, and Roy Henry Stout were defendants; in the second case, John W. Dailey, Robert E. Lukens, and James F. Bogue were defendants; in the third case, William Lloyd Barnard, Walton H.

Morse, and Homer A. Kelley were defendants; in the fourth case, Donald Henry Smalligan, Peter John Smedes, and William Lloyd Barnard were defendants; and for convenience, reference will be made to the several defendants as Barnard, Humphrey, Smalligan, Smedes, Stout, Lukens, Bogue, Morse, and Kelley, respectively.

The indictment in the first case contained five counts. The first count charged that all of the defendants in that case entered into a conspiracy to violate Sections 51, 52, and 54, Title 41 United States Code Annotated, in the manner and by the means therein set forth. This was the manner and these were the means set forth in the count. General Motors Corporation was the prime contractor with the United States Air Force under a fixed price reimbursable contract with a price redetermination clause for the furnishing of airplanes. The prime contract was supplemented by a special facilities contract providing for cost reimbursement for the tools and equipment necessary to perform the contract to build airplanes. Barnard was employed by General Motors as head tool buyer, in which capacity he administered subcontracts and purchase orders awarded to other manufacturers and suppliers for the purchase of tools, equipment, and materials to be used in completing and furnishing the airplanes under the prime contract. Dailey was employed by General Motors as a tool buyer; later he became head tool buyer; and in such capacities, respectively, he administered subcontracts and purchase orders awarded to other manufacturers and suppliers for the purchase of tools, equipment, and materials to be used in completing and furnishing airplanes under the prime contract. Stout was an employee of General Motors. He resigned such position and became one of the owners of Plastic Tooling, Inc., a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of airplanes under the prime

contract. Smalligan and Smedes were the owners of Tri-Arts Industries, Inc.; and after a specified date, Smalligan, Smedes, and Stout became the owners of Plastic Tooling, Inc., each of which firms was a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of airplanes under the prime contract. Humphrey was one of the owners or officers of Summit Engineering Company, a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of airplanes under the prime contract. Stout was one of the owners of Magic Circle Tool Engineering Company, a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of airplanes under the prime contract. And it was the plan and purpose of the conspiracy that Barnard and Dailey would accept payments of fees, commissions, gifts, gratuities, and compensations paid by Humphrey, Smalligan, Smedes, and Stout as inducements for the aid and assistance of Barnard and Dailey in obtaining and procuring the award of purchase orders and subcontracts in favor of the firms mentioned in the indictment.

The second count charged that Smalligan, Smedes, and Stout, knowingly and unlawfully on behalf of a subcontractor, gave to Dailey, an officer, employee, and agent of a prime contractor holding a contract entered into by a department, agency, and establishment of the United States for the furnishing of supplies, equipment, materials, and services on a cost reimbursement basis, and Dailey, knowingly and unlawfully received, an automatic clothes washer and a clothes drier, as an inducement for the awarding of subcontracts or orders from the prime contractor and as an acknowledgment of subcontracts and orders previously awarded. The third count charged that Smalligan and Smedes, on behalf of a subcontractor, knowingly and unlawfully, gave to Barnard, an officer, employee, and

agent of a prime contractor holding a contract entered into by a department, agency, and establishment of the United States for the furnishing of supplies, equipment, materials, and services on a cost reimbursement basis, and Barnard, knowingly and unlawfully, received the sum of $3,004.20 as an inducement for the awarding of subcontracts or orders from the prime contractor and as an acknowledgment of subcontracts and orders previously awarded. The fourth count charged that Stout, on behalf of a subcontractor, knowingly and unlawfully gave to Dailey, an officer, employee, or agent of a prime contractor holding a contract entered into by a department, agency, and establishment of the United States, and Dailey, knowingly and unlawfully, received an automatic dishwasher of the value of $260 as an inducement for the awarding of subcontracts or orders from the prime contractor and as an acknowledgment of subcontracts and orders previously awarded. And the fifth count charged that Stout, on behalf of a subcontractor, knowingly and unlawfully, gave to Dailey, an officer, employee, or agent of a prime contractor holding a contract entered into by a department, agency, and establishment of the United States for the furnishing of supplies, equipment, materials, and services on a cost reimbursement basis, and Dailey, knowingly and unlawfully, received $610 as an inducement for the awarding of subcontracts or orders from the prime contractor and as an acknowledgment of subcontracts and orders previously awarded.

The indictment in the second case contained only one count. It charged that Dailey, Lukens, and Bogue conspired to violate Sections 51, 52, and 54 supra. The substance of the conspiracy as pleaded was that General Motors entered into the contract with the Air Force to furnish the airplanes; that Dailey was employed by General Motors as a tool buyer; that in such capacity he administered subcontracts and purchase orders awarded to other manufacturers and suppliers for the purchase of tools, equipment, and materials to be used in completing and furnishing the airplanes; that Lukens was president and Bogue was sales manager of Lukens Aluminum Corporation, and Lacorp Machine Tool Company; that each firm was a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of airplanes under the contract; that Lukens and Bogue, on behalf of Lukens Aluminum Corporation and Lacorp Machine and Tool Company, solicited and received orders to furnish tools, equipment, and materials to General Motors; and that it was the plan and purpose that Dailey would accept from Lukens and Morse payments of fees, commissions, gifts, gratuities, and compensations as an inducement for the aid and assistance of Dailey in obtaining and procuring the award of purchase orders and subcontracts in favor of Lukens Aluminum Corporation and Lacorp Machine and Tool Company.

The indictment in the third case contained three counts. The first count charged that Barnard, Morse, and Kelley conspired to violate Sections 51, 52, and 54, supra. The substance of the conspiracy as pleaded was that General Motors and the Air Force entered into the contract for the furnishing of airplanes; that Barnard was employed by General Motors as tool buyer, in which capacity he administered subcontracts and purchase orders awarded to other manufacturers and suppliers for the purchase of tools, equipment, and materials to be used in completing and furnishing the airplanes; that Morse and Kelley were partners in the Mead Manufacturing Company, a manufacturer and supplier of tools, equipment, and materials to General Motors which were used in the manufacture of the airplanes; that Morse and Kelley, on behalf of Mead Manufacturing Company, solicited orders to furnish tools, equipment, and materials to General Motors and received orders which orders were produced and supplied; and that it was the plan and pur-

pose that Barnard would accept payments of fees, commissions, gifts, gratuities, and compensations paid by Morse and Kelley as an inducement for his aid and assistance in obtaining and procuring the award of purchase orders and subcontracts in favor of Mead Manufacturing Company. The second count charged that Morse and Kelley, on behalf of a subcontractor, knowingly and unlawfully paid to Barnard, an officer, employee, and agent of a prime contractor for the furnishing of supplies, materials, equipment, and services on a cost reimbursable basis, and Barnard, knowingly and unlawfully received from Morse and Kelley, the sum of $587 as an inducement for the award of subcontracts or orders from the prime contractor and as an acknowledgment of subcontracts or orders previously awarded. And the third count charged that Morse and Kelley knowingly and unlawfully paid to Barnard, and Barnard knowingly and unlawfully received from Morse and Kelley, $522 as an inducement for the award of subcontracts or orders and as acknowledgment of subcontracts and orders previously awarded.

And the indictment in the fourth case contained a single count. It charged that Smalligan and Smedes, on behalf of a subcontractor, knowingly and unlawfully gave to Barnard, formerly an officer, employee, and agent of a prime contractor holding a contract entered into by a department, agency, and establishment of the United States for the furnishing of supplies, equipment, and materials, and services on a cost reimbursement basis, and Barnard, knowingly and unlawfully received the sum of $3,004.20 as an acknowledgment of subcontracts and orders awarded during the time Barnard was acting as such officer, employee, and agent.

Motions were filed to dismiss the several indictments. The substance of the motions in the first, second, and third cases was in each instance that the indictment failed to state facts sufficient to constitute an offense against the United States; that the indictment was fatally defective for failure to allege the existence of a "cost-plus-a-fixed-fee or other cost reimbursable basis" contract; and that upon production and examination, the contract disclosed upon its face that it was a "fixed price" contract and not a "cost-plus-a-fixed-fee or other cost reimbursable basis" contract. The motion to dismiss the indictment in the fourth case is not in the record before us. The motions were sustained; the indictments dismissed; and the United States appealed.

Sections 51, 52, and 54, supra, relate to kickbacks on Government contracts. Section 51 forbids the payment of any fee, commission, or compensation of any kind, or the granting of any gift or gratuity of any kind, directly or indirectly, by or on behalf of a subcontractor, as defined in section 52, to any officer, partner, employee, or other agent of a prime contractor holding a contract entered into by any department, agency, or establishment of the United States for the furnishing of supplies, materials, equipment, or services of any kind on a cost-plus-a-fixed-fee or other cost reimbursable basis; or to any such prime contractor or to any officer, partner, employee, or agent of a higher tier subcontractor holding a subcontract under the prime contractor, or to any such subcontractor, either as an inducement for the award of a subcontract or order from the prime contractor or any subcontractor, or as an acknowledgment of a subcontract or order previously awarded. Section 52 defines the term "subcontractor" for the purposes of sections 51–54. And section 54 provides that any person who shall knowingly, directly, or indirectly, make or receive any such prohibited payment shall be punished as therein specified. Considered together, these statutes are penal in character and should therefore be construed strictly. They cannot be enlarged by implication or intendment beyond the fair meaning of the language used. But the object of all construction, whether of penal or other statutes, is to ascertain the legislative intent. And the

rule of strict construction does not require that a penal statute be strained or distorted in order to exclude from its reach acts or conduct which the legislative body intended to bring within its scope. The exactions of the rule are met in full measure if the language is given its fair meaning in accordance with the obvious intent of the legislative body. Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532; United States v. Raynor, 302 U.S. 540, 552, 58 S.Ct. 353, 82 L.Ed. 413; United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457.

■ Section 51, supra, is limited in reach to kickbacks given and received in connection with contracts on a cost-plus-a-fixed-fee or other cost reimbursable basis. And therefore unless the prime contract awarded to General Motors was of that kind, the indictments were fatally infirm and were providently dismissed. In a document or certificate seemingly issued in connection with a letter contract which preceded the execution of the formal prime contract, it was stated in substance that a fixed price contract was contemplated. The prime contract contained several references to it being a fixed price contract. Several supplements were designated as supplemental agreements to fixed price contract. And the prime contract provided in each instance specified unit prices for various units of aircraft and parts produced. But it did not provide that it was intended or understood to be a fixed price contract. And it provided for redetermination of prices, both prospectively and retrospectively. It provided that upon the acceptance of the seventy-first airplane, the parties should negotiate to revise the prices of all items theretofore or thereafter delivered. It further provided that after acceptance of the two hundred and ninety-ninth airplane, the parties should negotiate to revise the prices of all items thereafter to be delivered. It further provided that the contractor should submit to the contracting officer accounting data for consideration in connection with negotiations looking toward the revision in prices. It further provided that the parties should negotiate promptly and in good faith. And it further provided that after each negotiation, the agreement reached should be evidenced by a supplemental agreement stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision. No limitation was fixed upon the range of redetermination or revision of prices, upward or downward. No ceiling or floor was specified beyond which the revised or redetermined prices could not go. The provision that upon the acceptance of the seventy-first airplane, the parties should negotiate in good faith respecting the prices of all items theretofore or thereafter delivered reasonably and impliedly contemplated that instances could and perhaps would arise in the course of fixing revised prices for items theretofore delivered which would involve reimbursement of the prime contractor for costs incurred. In other words, the provision reasonably contemplated that in the course of renegotiation and revision in prices for items theretofore delivered, reimbursement for costs incurred would be made in some instances. Not only did the provision contemplate reimbursement for costs in some instances, but the expressed obligation resting upon the Government to negotiate in good faith respecting revisions in prices for items theretofore furnished impliedly required the Government to reimburse the prime contractor for costs incurred when the facts justified reimbursement. When all of the provisions in the contract are considered together as constituent parts of a harmonious whole, it cannot be said that the contract was exclusively a fixed price contract as distinguished from a cost reimbursable basis contract. It partook of both aspects. It was in substance and effect a fixed price and "other reimbursable basis contract". And partaking in part of an "other reimbursable basis contract", it came within the range of section 51, supra.

■■ Reliance is placed upon regulation 3.403–3, 32 C.F.R. § 3.403–3, pro-

mulgated by the Secretary of Defense to place or classify the prime contract awarded to General Motors in the class of a fixed price type of contract and therefore outside the purview of section 51, supra. It is the well settled rule of law that a regulation promulgated by an administrative agency charged with the administration of an act has the force and effect of law if it is reasonably adapted to the administration and enforcement of the act and does not contravene some statutory provision. Maryland Casualty Co. v. United States, 251 U.S. 342; 40 S.Ct. 155, 64 L.Ed. 297; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194. But the regulation referred to was one of comprehensive general regulations promulgated for the purpose of establishing and promoting uniform policies and procedures relating to the procurement of supplies and services under the authority of the Armed Services Procurement Act of 1947, 62 Stat. 21, as amended.[1] It was not promulgated under section 51, supra. It is completely unrelated to the statute. And therefore it is without probative effect here.

The indictments did not charge that the donors or recipients of the kickbacks knew of the existence of the fixed price cost reimbursable basis contract between General Motors and the Air Force. Section 51, supra, forbids the "knowingly" giving or receiving of kickbacks. And the indictments charged the "knowingly" giving and receiving of the kickbacks therein referred to. But the statute does not limit its application to persons having knowledge of the nature of the prime contract. In other words, the statute does not make knowledge of the terms of the prime contract an essential element of the offense to be charged in the indictment. Hanis v. United States, 8 Cir., 246 F.2d 781.

The judgments are severally reversed and the causes are remanded with directions to deny the motions to dismiss the indictments.

[1]. Now 10 U.S.C.A. §§ 2301, 2303–2305.