**UNITED STATES of America,**
**Appellee,**

**v.**

**Bernard D. GROSSMAN, Appellant.**

**No. 11959.**

United States Court of Appeals
Fourth Circuit.

Argued March 8, 1968.

Decided July 18, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 453.

Roy G. Hall, Jr., Winston-Salem, N. C., and Ralph N. Strayhorn, Durham, N. C., (E. C. Bryson, Jr. and Newsom, Graham, Strayhorn & Hedrick, Durham, N. C., and Hatfield, Allman & Hall, Winston-Salem, N. C., on brief), for appellant.

William H. Murdock, U. S. Atty. (Richard M. Dailey, Jr., Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and MERHIGE, District Judge.

WINTER, Circuit Judge:

Convicted under two counts of an indictment charging violations of the "Anti-Kickback" Act, 41 U.S.C. §§ 51, 54 [1] and sentenced to concurrent terms of three months, and fined $2,500, on each count, defendant appeals, assigning numerous grounds for reversal. We reverse defendant's conviction and award him a new trial, because of prejudicial argument by the prosecutor. In so doing we notice only those of defendant's other grounds of appeal as might constitute a bar to retrial.

In count one of the indictment, defendant, an officer of Modern Screw Machine Company, Inc., of Wallington, New Jersey, was charged with having given to Nicholas Sterling Sinhel, an employee of Western Electric Company, 255 pounds of candy, cigars, whiskey and 14 cases of beer, a "fee, commission, com-

---

[1]. The pertinent provisions of 41 U.S.C. are as follows:

" § 51. Fees or kick-backs by subcontractors on negotiated contracts; recovery by United States; conclusive presumptions; withholding of payments

The payment of any fee, commission, or compensation of any kind or the granting of any gift or gratuity of any kind, either directly or indirectly, by or on behalf of a subcontractor, as defined in section 52 of this title, (1) to any officer, partner, employee, or agent of a prime contractor holding a negotiated contract entered into by any department, agency, or establishment of the United States for the furnishing of supplies, materials, equipment or services of any kind whatsoever; or to any such prime contractor or (2) to any officer, partner, employee, or agent of a higher tier subcontractor holding a subcontract under the prime contract, or to any such subcontractor either as an inducement for the award of a subcontract or order from the prime contractor or any subcontractor, or as an acknowledgement of a subcontract or order previously awarded, is prohibited. * * *"

* * * * *

" § 54. Same; penalties

Any person who shall knowingly, directly or indirectly, make or receive any such prohibited payment shall be fined not more than $10,000 or be imprisoned for not more than two years, or both."

pensation, gift and gratuity" as an inducement to Western's award of subcontracts and orders to Modern Screw in violation of the statute. In count two, defendant was charged with having given to Western's employee Walter Roland Clitherow 200 shares of stock in Developers Small Business Investment Corporation, of a value of $1,000, for the same purpose.

The proof adduced at trial showed that Western had a number of prime negotiated contracts with the Department of the Army, many of which were for research and development of the Nike missile defense system. Sinhel and Clitherow were, respectively, an assistant buyer and buyer of Western. Sinhel had authority to make purchases up to $2,000, and Clitherow had authority to make purchases up to $15,000. Modern Screw was a subcontractor to Western, filling purchase orders for parts and equipment used by Western in performing its army contracts. Modern Screw did practically all of its business with Western, and Sinhel and Clitherow placed over 95% of Western's business with Modern Screw. Defendant had been doing business with Western for as long as 25 years. He was so familiar with Western's future needs that he maintained an inventory valued in excess of $500,000, of parts ordered by Western.

During 1961 and 1962, when Sinhel was placing purchase orders with defendant under Western's prime negotiated contracts, defendant, from time to time, gave Sinhel quantities of candy, cigars, beer and liquor. Sinhel, who stated that he also received gifts from other suppliers, admitted that such gifts caused him to favor them in the award of purchase orders or subcontracts. The gift of stock was made to Clitherow early in 1962 by defendant's arranging for his New York broker to mail the stock certificates to Clitherow at the home of his mother, in New York, who forwarded them to Clitherow in Winston-Salem, North Carolina. Defendant paid for the stock in March, 1962. In approximately July, 1962, Clitherow sent defendant a check for $1,000; but this was several months after Clitherow and defendant became aware that an investigation of Modern Screw's prices had been made, and that Modern Screw was found to be making a profit of 35%–45% on its business with Western.

■ Without detailing all of the evidence contained in the record, we are satisfied from our review of it that in general there was a substantial evidentiary basis from which the jury could find defendant's guilt beyond a reasonable doubt. We find no error in the instructions or evidentiary rulings. We turn then, to the more important grounds of attack.

■ First, defendant contends that, with regard to the stock purchased for Clitherow, defendant could not be guilty of a crime committed in the Middle District of North Carolina because the certificates for the shares were delivered in New York, either by delivery by the seller of his endorsed certificates to the broker acting for defendant and Clitherow, or by delivery of new certificates by the broker or the issuer to Clitherow's mother. The effect of delivery, so the argument runs, vested title in Clitherow and, hence, "payment" proscribed by 41 U.S.C. §§ 51 and 54 occurred in New York. Delivery in this place, it is claimed, thus bars prosecution in the Middle District of North Carolina.

Defendant is, of course, correct in asserting the jurisdictional imperative that an offense be committed within the state and district of indictment,[2] but defendant's argument in stressing the original place of delivery of the certificates and defendant's lack of control over ultimate delivery is erected upon a faulty premise.

2. U.S. Constitution, Art. III, § 2, cl. 3; U.S. Constitution, Amend. VI; Rule 18, F.R.Crim.Pro.; see also, Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958).

Ownership of stock in a corporation is ownership of a species of intangible personal property and, by accepted rules, intangible personal property acquires a situs in the place of domicile of the owner. Actual delivery of the certificates to Clitherow in North Carolina was merely delivery of evidence of ownership and evidence that the transfer was made. This is so because Clitherow was not an unwilling donee who declined to accept the gift, or to accept the certificates when they were forwarded to him. Moreover, the broker, in accepting delivery of the seller's certificates in New York, was acting for Clitherow. The evidence shows that Clitherow's mother, who was away when delivery was made to her, forwarded the certificates to her son at his request, so that it follows that she, too, was acting for Clitherow in accepting the certificates. There can be no question but that the intention of the parties was to vest ownership of the shares in Clitherow, and to place the new certificates therefor in his hands, at a time when he was domiciled and was physically present in the Middle District of North Carolina, where the prosecution was laid, and that the delivery to the broker and the delivery to Clitherow's mother, followed by delivery by her to Clitherow, were but steps in a continuing transaction. Because the whole purpose of the transaction was to vest ownership of the stock in Clitherow in Winston Salem, in the Middle District of North Carolina, and to place the stock certificates in his physical possession in that state and since that overall purpose was accomplished, we think that "payment" proscribed by the statute was made in the Middle District of North Carolina and that the nice questions of jurisdiction and venue do not then depend upon technical considerations of the exact time and place that title passed to Clitherow.

■■ Nor do we find merit in the argument that defendant was improperly convicted because proof was lacking that defendant knew that Western's contracts were "negotiated contracts" so as to render 41 U.S.C. §§ 51 and 54 applicable. The short answer to the contention is that other circuits have held that knowledge of the terms of the prime contract is not an essential element of the statutory crime, and with them we are in accord. Hanis v. United States, 246 F.2d 781 (8 Cir. 1957); United States v. Barnard, 255 F.2d 583 (10 Cir. 1958). See also, Howard v. United States, 345 F.2d 126, 129 (1 Cir. 1965). The use of "knowingly" in § 54 as modifying the phrase "make or receive any such prohibited payment" requires only, insofar as is pertinent to defendant, that defendant knew that he was making a payment in order to induce a contract to be awarded to Modern Screw. The proof overwhelmingly supports an affirmative conclusion in this regard.

■ We are not persuaded by defendant's argument that § 54 was not shown to have been violated because property as distinguished from money, was what passed from defendant to Sinhel and Clitherow. It is true that § 51 prohibits the *"payment* of any fee, commission, or compensation of any kind *or* the *granting* of any gift or gratuity of any kind," (emphasis supplied) to induce the award of a subcontract or as an acknowledgment of a subcontract previously awarded, but that § 54 which provides the criminal sanction purportedly applies only to persons who make or receive "any such prohibited *payment*" (emphasis supplied). No good reason is apparent why Congress should outlaw the payment of money or the granting of a gift for the prohibited purposes, but yet provide a criminal penalty only for the payment of money.[3] To read § 54

---

3. The "Anti-Kickback" Act was first enacted in 1946, 60 Stat. 37. As originally enacted it applied only to contracts "on a cost-plus-a-fixed fee or other cost reimbursable basis." As negotiated contracts thereafter became increasingly the rule, the Act was amended in 1960 (Pub. L. 86–695; 74 Stat. 740) to broaden its scope. See, 1960 U.S. Code Cong. and Adm.News, p. 3292. The legislative history is otherwise unenlightening on the problem at hand.

thus would be unduly to frustrate the general purpose of the Act. The gift of property may be as great, or even greater, an inducement for an illegal purpose as the payment of money. Section 54 need not be read as restrictively as defendant asserts. "Payment" in § 54—particularly *"such* prohibited payment"— may be read as referring to any kind of transfer proscribed by § 51. We think that § 54 should be so read. This construction is one which has been assumed by previous decisions. United States v. Barnard, supra; Howard v. United States, supra.

█ Nevertheless, the judgments must be reversed and a new trial granted by reason of the following:

Sinhel, the person to whom defendant was charged with improperly having given candy, cigars, whiskey and beer, was a witness for the government. On redirect examination and over repeated objection, the prosecutor was permitted to ask Sinhel if he had made certain *cash* deposits to his bank account during 1961 and 1962 and whether these deposits amounted to "many thousands of dollars." Sinhel denied that the deposits amounted to this much, and he was unable to remember various deposits of $50 to $500 on various dates about which he was interrogated. After inquiry about four specific deposits, the trial judge sustained the objection and the inquiry took a different course. Although objection was sustained, the prosecutor, on direct examination, asked Sinhel if he had pleaded guilty to receiving gifts from suppliers in 1961 and 1962 and whether he had been charged with accepting gifts from suppliers.[4]

Against this background, the prosecutor, in his closing argument to the jury stated that the court would charge that before the jury could return a verdict of guilty it must find that any gift or gratuity was given for the purpose of inducing the award of a contract or a purchase order, or an acknowledgment of one that had been awarded. The prosecutor argued that he did not know why the defendant made gifts to Sinhel, and stated:

> " * * * Can you think of any reason under the sun why Mr. Grossman would be spending hundreds and hundreds of dollars to buy this beer, candy, and other stuff, and giving it to employees of Western Electric, if it wasn't as an acknowledgment [sic] of something that they had done for him or something to induce them to give him something in the future? *Does he look like that kind of man? Does he look like a philanthropist to you? You have a right to look at him.* What other reason would he have for it? What effect did it have on these people?" (emphasis suplied)

In connection with this argument, it should be noted that the defendant did not testify in his own behalf.

The prosecutor then adverted to Sinhel's testimony that he probably favored persons from whom he received gifts and favors in awarding contracts for business. The prosecutor stated that it was for this purpose that the Act was passed, and added:

> " * * * I don't know; you know, the beer and the candy and the other stuff that was testified about here kind of *reminds me of an iceberg; Mr. Strayhorn [defendant's counsel] would lead you to believe it was just a little block of ice floating down, but to me it's just the tip of a big iceberg.* You know why I say that? It's hard for me to believe that Mr. Sinhel or anybody else could be influenced by this alone. * * * I don't believe that Sinhel could be bought for as little as we have been able to show that he

4. The district judge, at the time the questions were asked, cautioned the jury not to consider the questions or what the answer would have been. In his instructions, the district judge instructed the jury generally to disregard any question to which an objection was lodged, where the objection was sustained, and not to speculate what the witness would have answered if permitted to do so.

received here. * * *" (emphasis supplied)

We would have a serious doubt about the propriety of the prosecutor's interrogating Sinhel if he had pleaded guilty to a violation of the Act if, as represented to us by defendant's counsel in argument, the prosecutor knew that Sinhel had pleaded not guilty, and we would have serious doubt about the propriety, in the absence of surprise or a showing of hostility on the part of Sinhel, of the prosecutor's apparent disavowal of Sinhel as a government witness and his attempt to interrogate him on specific cash deposits, but we need not decide these questions, especially in view of the cautionary instructions as to the former. Nor need we decide the propriety of the prosecutor's inviting the jury to look at the defendant, when the defendant had not testified, so that the argument must be construed to be one inviting a determination of guilt or innocence on facial characteristics and not an argument to judge the credibility of a witness in part by his demeanor and manner of testifying. It is sufficient that the former provided the setting for implanting in the minds of the jury the notion that Sinhel had engaged in other related crimes and making that notion explicit with regard to defendant by the "tip of the iceberg" argument.

In short, the prosecutor insinuated that Sinhel had been given many gifts and gratuities for an illegal purpose, probably from defendant, beyond those for which defendant was charged and beyond those for which proof was offered at the trial. The prejudice to a defendant of inviting conviction on facts—if they be such—dehors the record is counter to the basic concept of fairness. From the representative of the United States, a sovereign whose duty it is to govern impartially, and a person in whom the average jury has confidence that he will faithfully observe his trust, the thrust of the statements, in the context made, destroyed fairness and equal justice. Reversible error clearly occurred. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L. Ed. 1314 (1935); Dunn v. United States, 307 F.2d 883 (5 Cir. 1962); United States v. Bugros, 304 F.2d 177 (2 Cir. 1962); United States v. Tucker, 267 F.2d 212 (3 Cir. 1959).

Reversed and remanded.