**In the Matter of the MAY 1972 SAN ANTONIO GRAND JURY.**

United States District Court,
W. D. Texas,
San Antonio Division.
Nov. 5, 1973.

Anthony Nicholas, San Antonio, Tex., Nago L. Alaniz, San Diego, Tex., for George B. Parr.

Marvin F. Foster, Jr., San Diego, Tex., Charles E. Orr, Houston, Tex., for Eunice E. Powell and Bryan P. Taylor.

William S. Sessions, U. S. Atty., John Clark, 1st Asst. U. S. Atty., San Antonio, Tex., for Government.

SPEARS, Chief Judge.

This matter grew out of indictments returned April 6, 1973, by the May, 1972 San Antonio grand jury, charging George B. Parr, Eunice E. Powell and Bryan P. Taylor, hereinafter referred to as movants, with evasion of income tax, and the filing of false and fraudulent returns, in violation of Title 26 U.S.C. §§ 7201, 7206(1) (Internal Revenue Code). On May 2, 1973, Judge Suttle of this district granted motions dismissing said indictments, noting that they charged the commission of offenses in either the Southern District of Texas or the Austin Division of the Western District of Texas, and saying, in part:

"As [the Plan Providing for Random Selection of Grand and Petit Jurors in the Western District of Texas] has been interpreted and implemented . . . , divisional grand juries cannot indict for offenses not committed within their respective divisions."

After the dismissal of the indictments, this Court, on May 3, 1973, granted the motion of the United States requesting the transfer of all grand jury exhibits and testimony to the federal grand jury in the Corpus Christi Division of the Southern District of Texas, for disclosure in connection with an investigation of possible violations of the Internal Revenue Code.

By motions subsequently filed in this Court, the movants sought to vacate this Court's order of May 3, 1973, and to suppress all testimony and exhibits presented to the San Antonio grand jury. Their contentions rest almost solely upon one sentence contained in the Plan Providing for Random Selection of Grand and Petit Jurors in the Western District of Texas, which provides: "Grand juries shall consider only cases triable in the division or divisions from which the grand jurors are drawn." Movants argue that since the offenses allegedly took place in either the Southern District of Texas, or in the Austin Division of the Western District of Texas, the substantive case could never have been tried in the San Antonio Division, and thus the plan bars *any* grand jury impaneled solely from the San Antonio Division from investigating *any* matters

surrounding the alleged tax offense. As a consequence, they reason that all subpoenas issued or testimony or evidence received by the San Antonio grand jury are illegal from the inception. In addition, they maintain that they were entitled to notice and hearing prior to the transfer of the grand jury testimony and exhibits to Corpus Christi. For the reasons and to the extent hereinafter set forth, the relief sought by the movants is denied.

## I.

The critical sentence in the local plan was adopted pursuant to the Jury Selection and Service Act of 1968. This Act, for the first time, implemented a nationwide system for the selection of federal juries by random drawings from voter registration lists.[1] Prior to the adoption of the 1968 Act, federal juries were selected by the "key-man" system, under which a jury commission or commissioner would ask "suggestors" to offer the names of those who met the statutory qualifications for jury service, and possessed "good character". Names solicited from the suggestors, from court personnel, and through the commission or commissioner's personal knowledge were placed in the master jury wheel. This system often resulted in racial, ethnic, and socio-economic imbalances, with jury panels far different from the actual make-up of the community from which they were drawn.

Federal juries were sometimes completely devoid of religious, racial or ethnic minorities, and were often characterized as "silk-stocking," since they were heavily weighted in favor of the more affluent in the community. In areas with a large black voting population, sometimes few, if any, of that group sat on either grand or petit juries. Clearly, this very personal and subjective selection system was subject to each and every bias and prejudice of the selectors, individually and collectively.

Under such a system, the representation of the community was no better than the knowledge, dedication and diligence of the jury commission or commissioner. Some commissions and commissioners simply chose those people familiar to them, and looked no further to the community at large. And yet even where commissions acted diligently and in good faith, abuse often resulted. As noted by the Fifth Circuit in Rabinowitz v. United States, 366 F.2d 34 (1966), when commissioners affirmatively attempted to select responsible and intelligent jurors, their exacting criteria would often lead them to the exclusion of prospective jurors they did not know. White jury commissioners, completely devoid of discriminatory intentions, suggested no blacks simply because of a total lack of contact and familiarity with the blacks in the community.[2]

On the other hand, the old key-man system could often operate in an assiduously fair manner, with diligent measures taken to insure that every identifiable racial, economic, geographic and professional group was represented. An extensive and comprehensive review of the selection procedures utilized in the San Antonio Division under the key-man system was made by Judge Henry N. Graven in United States v. Hunt, 265 F. Supp. 178 (W.D.Tex.1967), aff'd 400 F. 2d 306 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969). In Hunt, Judge Graven described at great length the efforts of the jury commissioner to acquire representation by all groups, including black,

---

1. It has long been established that the essential gravamen of fair jury selection focuses not upon the particular composition of any individual jury, be it fair or not, but upon the representational quality of the venire and panel from which the jury is drawn. Thiel v. Southern Pacific Co., 328 U.S. 217, 225, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); United States v. Bryant, 291 F.Supp. 542, 547 (D.Me. 1968).

2. Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed.2d 84 (1940).

whites, and Mexican-Americans, as well as various economic and age groups.[3]

However, rather than depend on the vagaries of individual commissioners in each division or district, Congress adopted the 1968 Jury Selection and Service Act, the policy of which, as delineated in 28 U.S.C. § 1861, is "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." The Act eliminated the key-man system, and instead substituted the mandatory requirement that the names for the master jury wheel be drawn at random from voter registration lists or from lists of actual voters, duly amended and supplemented and thus to keep them current, reflect the policy of the Act.[4]

The heart of the legislation—random selection from voter lists—struck at the primary complaints lodged against the key-man system. Use of voter lists and a random selection would eliminate any possibility of discrimination in jury selections; and the jurors in the master wheel would automatically correspond proportionately to the number of qualified voters of various ethnic and racial groups in the community, in addition to insuring the representation of socio-economic groups in accord with their community strength. Fairer and more representational grand juries would be selected with less work, and with less dependence placed upon the vagaries of personal knowledge. Section 1863 also provided significant leeway for local variations in the plans adopted by different districts, with the provision that plans so adopted be approved by the appropriate judicial councils.

II.

In the Plan for Random Selection of Jurors for the Western District of Texas,[5] approved by the Fifth Circuit Judicial Council, the language, "grand juries shall consider only cases triable in the division or divisions from which the grand jurors are drawn," was included at the insistence of the Council.[6] Pre-

3. As noted by Judge Graven, the Jury Commissioner devoted great time and diligence to the compilation of a cross-sectional jury list, even inviting leaders of different ethnic, racial, and economic communities to his home in order to solicit a wide variety of names.

4. The 1968 Act required, among other mandatory provisions, that a minimum number of names be placed in the master jury wheel; that the local plan specify those groups that might be excused from service upon request; that those groups barred from jury service be listed; and that juror qualification forms be completed.

See generally 1968 U.S.Code Congressional and Administrative News, p. 1792; Hearings on S. 383, 384, 385, 386, 387, 989, 1319, Proposals to Improve Judicial Machinery for the Selection of Federal Juries Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 90th Cong., 1st Sess., (1967).

5. Actually, this district had entered an order on April 25, 1967, providing for random jury selection long before the effective date of the the 1968 Act, and the eventual plan adopted pursuant to the Act varied little from the 1967 plan.

6. Formal requests have been made that the Judicial Council delete the quoted language from the plans of this district and the Southern District of Texas. These requests are based primarily upon the fact that it is expensive and inefficient in a large geographical district to conduct grand jury proceedings in each and every division on a regular basis. Usually, in most matters, a single government investigator from the appropriate agency testifies before the grand jury as to the facts of each case, so it would seem more logical for a few agents to travel to the divisions where the volume of cases requires regular grand jury sessions, than for the Court and the United States Attorney, together with supporting staff, to travel to every division in the district.

It is no answer to the problem to suggest that a grand jury may be drawn comprised of jurors from two or more divisions to serve those divisions, because in both districts the distances are too great. In the Southern District the heavy criminal caseloads are in Houston, Brownsville and Laredo. Brownsville is 400 miles from Houston, and Laredo is 360 miles away. In this district, the heavy criminal dockets are in San Antonio, Del Rio and El Paso. San Antonio and Del Rio are 160 miles apart, and El Paso is 600

sumably, the purpose of the provision was to make it less likely that the cross-sectional representation contemplated by the Act would be undermined by diluting minority groups in a sea of names taken from the voting populace of the district as a whole, or from another division with an entirely different population, economically, ethnically or racially. In any event, the quoted language must be considered in light of the amendments to Rule 18, F.R.Cr.P., promulgated in 1966, some two years prior to the enactment of the Jury Selection and Service Act of 1968. These amendments eliminated the venue provision requiring criminal trials to be held in the appropriate division,[7] and provided that "the prosecution shall be had in a *district* in which the offense was committed." [8]

The notes of the Advisory Committee on Rules set out the reasoning supporting the change back to district-wide venue:

> The former requirement for venue within the division operated in an irrational fashion. Divisions have been created in only half of the districts, and the *differentiation between those districts with and those without divisions often bears no relationship to* comparative size or population. In many districts a single judge is required to sit in several divisions and only brief and infrequent terms may be held in particular divisions. As a consequence under the original rule there was often undue delay in the disposition of criminal cases—delay which was particularly serious with respect to defendants who had been unable to secure release on bail pending the holding of the next term of court.

■■ If the quoted language in this district's plan is construed as a limitation upon Rule 18, as amended, it may well be that it could not stand.[9] However, it would seem that the language referred to would be completely consistent with the rule if it were interpreted to simply require that a defendant indicted in one division must be prosecuted in that same division. The Austin Division is one of the divisions in which the alleged offenses were committed, so there is actually no reason under the law why the movants could not have been both indicted and tried in the San Antonio Division, since both the Austin and the San Antonio Divisions are in the same district. However, inasmuch as the judges of this district understood at

---

miles from San Antonio. It would be unfair to jurors to ask that they travel these long distances on a regular basis for one or two days' work.

Recognizing the clearly expressed intent of Congress to remove any obstacle to speedy trial, as expressed through its amendment of Rule 18, it becomes self-defeating to then reimpose the same delay caused by the old trial venue provision through application of an equally restrictive grand jury venue provision. As noted by the Advisory Committee on Rules, when a single judge must sit in several divisions sporadically throughout the year, criminal trials must await a monthly or quarterly session of the court in a given division. Likewise, the same delay in disposition of criminal cases is caused if the requirement for indictment by a grand jury drawn only from the division in which the crime was committed is applied strictly. The criminal defendant would then have to await different sessions of court for convening of the grand jury, arraignment and trial.

Such an interpretation would promote speedier justice through district-wide venue on the one hand, while taking it away with the other through the requirement that a grand jury indict only for crimes committed in the division from which its members are selected.

7. The pre-1966 Rule 18 provided that "if the district consists of two or more divisions the trial shall be had in a division in which the offense was committed."

8. *E.g.*, Dupoint v. United States, 388 F.2d 39 (5th Cir. 1967).

9. ". . . [N]o rule of court can . . . abrogate or modify the substantive law . . . It is true of rules of practice prescribed by this court for inferior tribunals, as it is of those rules which lower courts make for their own guidance under authority conferred." Washington-Southern Navigation Co. v. Baltimore and Philadelphia Steamboat Co., 263 U.S. 629, 635–636, 44 S.Ct. 220, 222, 68 L.Ed. 480 (1924).

the time of the adoption and approval of the plan that the judicial council had interpreted the quoted language to mean that "divisional grand juries cannot indict for offenses not committed within their respective divisions," Judge Suttle, in the exercise of proper Court administration, dismissed the indictments against the movants, undoubtedly hoping that the government would appeal, thereby affording the judicial council, sitting as the Fifth Circuit Court of Appeals, an opportunity to re-examine and clarify its position in the matter. Unfortunately, however, the government chose not to appeal, thus giving rise to the proceedings now before this Court.

### III.

■ Assuming *arguendo* that the proper interpretation to be placed on the language of the plan would prohibit the return of indictments against the movants in the San Antonio Division, this Court can find no support whatsoever in the Constitution or case law for their contention that the consideration of their cases by the San Antonio grand jury has somehow abridged their constitutional rights; nor is this Court able to perceive any claim made by the movants which rises to the level of constitutional dimensions. Article 3, Section II of the Constitution provides that: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Sixth Amendment in more detail provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, . . . ."

The constitutional provisions for criminal venue provide only for trial in the proper district before a jury drawn from that state and district. Haas v. Henkel, 216 U.S. 462, 473–474, 30 S.Ct. 249, 54 L.Ed. 569 (1910). Even in light of the importance accorded criminal venue by the Constitution and noted numerous times by the Supreme Court,[10] courts have repeatedly held that these constitutional provisions are not jurisdictional,[11] and thus the right to trial in the district of the offense may be waived,[12] if not raised within a reasonably proper time.

While Congress has repeatedly expressed its intent, over a period of the last one hundred years, that trials shall be held in the divisions in which crimes are committed,[13] the Supreme Court has

---

10. Referring to Article 3, § 2 and the Sixth Amendment, Justice Frankfurter stated in United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944): "Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed."

11. *See, e.g.,* United States v. Bryson, 16 F.R.D. 431, 434 (N.D.Cal.1954), aff'd, 238 F.2d 657 (9th Cir. 1956), reh. den., 243 F.2d 837 (9th Cir. 1957), cert. denied, 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34 (1957).

12. Many cases hold venue waivable: Rivera v. United States, 388 F.2d 545 (2d Cir.), cert. denied, 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed. 2d 1396 (1968); Harper v. United States, 383 F.2d 795 (5th Cir. 1967); United States v. Costello, 381 F.2d 698 (2d Cir. 1967);

Boyes v. United States, 354 F.2d 31 (5th Cir. 1965); Yeloushan v. United States, 339 F.2d 533 (5th Cir. 1964); Thomas v. United States, 267 F.2d 1 (5th Cir. 1959). *But see,* United States v. Grossman, 400 F.2d 951 (4th Cir. 1968), cert. denied, 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968).

In addition, the Supreme Court has recently held that in a habeas corpus proceeding a petitioner who, three years after his conviction, challenged the composition of the grand jury which indicted him was bound by the waiver provision of Rule 12(b)(2), F.R.Cr.P. Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973).

13. *E. g.,* "And all prosecutions in either of said districts for offenses against the laws of the United States shall be tried in that division of the district to which process for the county in which said offenses are committed is by said

held since 1892 that various statutes requiring "prosecution" in the division in which the offense was committed, do not "affect the authority of the grand jury for the district, sitting at any place at which the court is appointed to be held, to present indictments for offences committed anywhere within the district." Logan v. United States, 144 U.S. 263, 297, 12 S.Ct. 617, 628, 36 L.Ed. 429 (1892). The Supreme Court reiterated its opinion that the word "prosecution" did not include the return of the indictment, in Salinger v. Loisel, 265 U.S. 224, 236, 44 S.Ct. 519, 68 L.Ed. 989 (1924), and the Court clearly recognized Congressional power to enact narrower provisions requiring trial and the return of the indictment in the division of the offense. As stated by the Supreme Court in Barrett v. United States, 169 U.S. 218, 221, 18 S.Ct. 327, 329, 42 L.Ed. 723 (1898), "As to where trial shall be had in a judicial district depends entirely on the legislation upon the subject." [14]

Even under the old provisions of Rule 18, F.R.Cr.P., providing for trial in the *division* in which the offense was committed, the Fifth Circuit in Lafoon v. United States, 250 F.2d 958 (1958), while recognizing the "constitutional right to a trial by jury in the state and district where the crime shall have been committed," held that "the right to be tried in the division as well as in the district where the offense was committed is a personal and technical right which can be waived. . . . The con-stitutional requirement for trial in the state and district of the offense does not apply to divisions within a district." In that case the Court went on to hold a plea of guilty a waiver of the right to trial in the division.

It should, therefore, come as no surprise that following the amendment of Rule 18 in 1966, the Fifth Circuit again reaffirmed the lack of significance of the division to the criminal defendant: "The recent amendment [to rule 18] had the effect of eliminating the division as a unit of venue in criminal cases. It remains as an administrative unit in those districts which are subdivided by law into divisions. However, the division has no constitutional significance; the vicinage is the district." Bostick v. United States, 400 F.2d 449, 452 (5th Cir. 1968), cert. denied, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 712 (1969).[15] And in United States v. Grayson, 416 F.2d 1073 (5th Cir. 1969), cert. denied, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970), where the defendant challenged the right of a divisional grand jury to inquire into offenses committed in another statutory division of the same district, the Court specifically rejected defendant's additional allegation that he had a guaranteed right to be indicted in the division in which the offense occurred, saying, "[t]he right to be *tried* before a jury from the vicinage is not impinged upon in the slightest by a finding of probable cause by an otherwise duly and legally constituted grand

section required to be returned." Act of June 14, 1880, c. 213, 21 Stat. 198. *See also* Act of August 13, 1888, c. 869, 25 Stat. 438. The Judicial Code of 1911 provided: "All prosecutions for crimes or offenses shall be had within the division of such districts where the same were committed. . . ." Act of March 3, 1911, c. 231, § 53, 36 Stat. 1087.

14. *See* Rosencrans v. United States, 165 U.S. 257, 17 S.Ct. 302, 41 L.Ed. 708 (1897); Post v. United States, 161 U.S. 583, 16 S.Ct. 611, 40 L.Ed. 816 (1896).

15. *See* United States v. Cores, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); United States v. Anderson, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946); United States

v. Florence, 456 F.2d 46 (4th Cir. 1972); United States v. Grayson, 416 F.2d 1073 (5th Cir. 1969), cert. denied, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970); Franklin v. United States, 384 F.2d 377, 378 (5th Cir. 1967), cert. denied, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968); United States v. Partin, 320 F.Supp. 275, 278 (E.D. La.1970).

Though the word "vicinage" at common law often meant the county, it more generally refers to neighborhood. 44 Words & Phrases 435 (1962). In the more strictly legal interpretation, it refers to the territorial jurisdiction of the court in which trial is held. United States v. Katz, 78 F.Supp. 21, 23–24 (M.D.Pa.1948).

jury in another division of the same judicial district." 416 F.2d at 1076.

## IV.

██ ██ Nor can movants find any comfort in their claim that under the local plan the consideration of their cases by the San Antonio grand jury falls outside the jurisdiction of that body. Strictly speaking, the jurisdiction of a grand jury is co-extensive with the jurisdiction of the Court of which it is an appendage. Hale v. Henkel, 201 U.S. 43, 55, 26 S.Ct. 370, 50 L.Ed. 652 (1906).[16] It seems especially inappropriate in this case to level an attack upon the jurisdiction of the San Antonio grand jury, in view of the fact that movants have never attacked the jurisdiction of the district court. Rather their attacks have centered solely upon questions of venue.

██ ██ The sentence in the local plan purporting to restrict grand jury consideration to those cases triable in the division from which they are drawn is not a jurisdictional limitation upon the San Antonio grand jury, but if valid, would constitute simply a venue restriction on cases properly brought before a specific grand jury. As has already been indicated in Part II above, when the 1966 rule and the local plan are taken together, this Court is of the opinion that they require only that a defendant cannot be indicted in one division and tried in another, though the use of the word "triable" could be interpreted to allow a grand jury indictment in any division where the case *could* be tried. Nevertheless, the understanding that the judicial council had interpreted the plan to mean that "divisional grand juries cannot indict for offenses not committed within their respective divisions," was demonstrated by the further provision of the plan authorizing the chief judge of this district to order a grand jury "drawn from the qualified juror wheels

of two or more divisions, on a substantially proportionate basis, to serve those divisions from which the grand jurors are drawn." This means of course, that if a grand jury meeting in one division is to consider a case triable in another division, the members must come from both divisions on a substantially proportionate basis; therefore a San Antonio grand jury would be prohibited from indicting for offenses committed outside this division. In such a case, if there was to be a compliance with the plan as interpreted by the council, the proper remedy for presentment of the indictment to the wrong grand jury had to be dismissal of the indictment. This is precisely what Judge Suttle did, and properly so.

██ But the petitioners urge this Court to carry this strict reading of the plan one step further, and vacate the transfer to Corpus Christi of the testimony taken before the San Antonio grand jury. This Court cannot agree that anything in the 1968 Act or the local plan was intended to go that far.

First, the policy of the enabling legislation under which the Western District adopted the plan is directed toward the protection of "litigants in federal courts entitled to trial by jury," through the provision of fair and widely representational juries. These rights are specifically directed only to *litigants*. Given the fact that a potential criminal defendant becomes a litigant only upon the return of an indictment, the 1968 Act and the local plan first focus upon an individual when he is made a defendant by virtue of such action by the grand jury. It may be one thing to contend that the San Antonio grand jury *could not* have returned a valid indictment against movants, but it is quite another thing to say that every subpoena issued, every witness heard, and every bit of evidence received is also tainted. The 1968 Act,

---

16. *See* United States v. Hill, 26 Fed.Cas. 315, 317, No. 15,364; In re Grand Jury Proceedings, 4 F.Supp. 283 (E.D.Pa.1933); United States v. Smyth, 104 F.Supp. 283, 296 (N.D. Cal.1952); Application of United Electrical, Radio and Machine Workers of America, 111 F.Supp. 858, 864 (S.D.N.Y.1953).

in conjunction with the plan adopted by this district, speaks to the final and indispensable act of the grand jury, to wit, its vote upon presentments. Any suggestion that the evidence and testimony before the San Antonio grand jury is contaminated is entitled to no credence whatever in light of the fact that the only objection lodged against it referred to the specific geographical area from which it was randomly selected.

■ If movants' position were accepted, and carried to its logical extreme, anytime a grand jury had completed all of its work and found that the offense originally thought to have been committed in one division was actually committed in another, then all of the evidence, testimony and exhibits would be barred from any further use by that or any other grand jury.[17] Such a result would seriously pervert the entire grand jury process, which is based upon the critical assumption that the grand jury functions as an investigative body, and in that capacity can receive evidence of acts outside its jurisdiction: "There is no question that when the grand jury is investigating a possible federal offense within its jurisdiction, it is authorized to receive evidence as to any acts related to the offense even though they occurred outside of its jurisdiction." LaRocca v. United States, 337 F.2d 39, 43 (8th Cir. 1964).[18] As the First Circuit has recently noted: "And, even when a grand jury produces evidence but does not return an indictment, that is insufficient to embargo its fruits." United States v. Doe, 455 F.2d 1270, 1274–1275 (1st Cir. 1972).

Movants allege that government counsel knew at the time the grand jury was impaneled that no offenses had been committed by them in this division, and contend that as a consequence thereof, all actions taken by the San Antonio grand jury with respect to them were null and void. Actually, in view of this Court's opinion, already expressed in Part II hereof, that there is no legal reason why the movants could not have been indicted and tried in the San Antonio Division, it is immaterial whether or not their allegation is true. But considering the fact that the place in which an offense is committed usually cannot be determined until the grand jury investigation is concluded, it would probably be difficult if not impossible to prove the allegation, even it it did raise a material issue; and keeping in mind the traditional secrecy afforded the proceedings of grand juries, this Court, in the absence of a showing of manifest injustice, would be unwilling either to permit an inquiry into the matter or to assume bad faith on the part of government counsel.

While this Court is fully satisfied that the order of May 3, 1973, which transferred the evidence to the grand jury for the Southern District of Texas complies in every respect with the strict technical requirements of the 1968 Jury Selection and Service Act, and the plan adopted pursuant thereto, it is nonetheless also concerned with whether or not any principle of fundamental fairness has been offended by the deliberations

17. Noting the changes in perspective toward ultimate criminal liability that take place during the course of a grand jury investigation, the Supreme Court observed in United States v. Procter & Gamble, 356 U.S. 677, 684, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958), that "the trails that looked fresh at the start faded along the way."

18. The Supreme Court pointed out more than fifty years ago that "the court and grand jury have authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within their jurisdiction." Blair v. United States, 250 U.S. 273, 283, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). See also United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920).

This Court cannot accept petitioners' interpretation that this would create grand juries with a roving commission to investigate crimes anywhere in the United States. The grand jury is an appendage of the court by which it is convened, Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960); Brown v. United States, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959), and its jurisdiction is generally restricted to the boundaries of the district in which it sits.

of the San Antonio grand jury. In this connection it is significant that movants have neither alleged nor shown that they have been prejudiced in any way.

The basic assumption underlying the 1968 Act and the local plan is that a defendant is entitled to be indicted and tried by juries of his peers, drawn from population groups and geographical areas most likely to mirror the community in which the offense was committed. It is interesting to note that it has never been held that defendants have any right to trials in their home communities.[19] Indeed, the provision in the Constitution which provides for trial in the district in which the crime was committed, and not the defendant's home district, shows a primary concern for trial in the area in which the public weal has been offended by the putative criminal act. When a grand jury votes on an indictment, and thereby exercises an essentially judgmental function, geographic or racial exclusion affecting the identity of those who compose its members might very well influence their collective judgment. But when it subpoenas exhibits and questions witnesses, the grand jury is performing a non-judgmental function in which the geographical area from which the grand jury members are drawn is of minimal importance. It is unreasonable to assume that a grand jury in one division is less likely to pursue its investigative tasks with diligence and ardor than a grand jury sitting in another division.

Lastly, it is possible that prejudice might result, if after dismissal of an indictment, the United States Attorney had been allowed to select portions of exhibits and testimony before a grand jury for transfer to another grand jury. A grand jury is capable of evaluating testimony and exhibits received by another grand jury only if it sees the efforts

of the prior grand jury *in toto*. To the extent that movants maintain that the transfer of only part of the material accumulated by a grand jury concerning certain individuals may be prejudicial, this Court agrees. However in the instant case the order of May 3, 1973, provided for the transfer of *all* relevant material without any deletions or extractions; no portions were selected therefrom. As the government alleged in its motion asking for the transfer, it would have been duplicated and wasteful for a second grand jury to retrace all the steps taken by the San Antonio grand jury over an eleven-month period, especially when no prejudice to movants' rights has been shown. Certainly the Corpus Christi grand jury had the power to call all of the witnesses heard by the San Antonio grand jury, and there is no allegation that there was a premeditated intent to use the San Antonio grand jury to achieve subpoena power or process over anyone not subject to the same powers of the Corpus Christi grand jury. It has never been held that a grand jury sitting pursuant to lawful authority is without right to call witnesses from outside the district.[20]

## VI.

■ Movants further contend that the transfer of evidence and testimony from San Antonio to Corpus Christi should not have been approved by this Court without having given them notice and a hearing. The difficulty with that position, however, lies in their assumption that the subjects of grand jury investigation are entitled as a matter of right to know that a transfer is contemplated, whereas the contrary is true. Both the well developed case law and Rule 6(e), F.R.Cr.P. demonstrate that

19. Platt v. Minnesota Mining and Manufacturing Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964).

20. *Cf.* United States v. Green, 305 F.Supp. 125, 128 (S.D.N.Y.1969); Rule 17(e)(1), F.R.Cr.P.

grand jury proceedings have traditionally been secret.[21]

Though a variety of reasons for grand jury secrecy exist, it is imposed as often to protect the rights of potential defendants as it is to protect the developing investigation into criminal activity. The proceedings of the grand jury are considered sacrosanct, and courts seldom explore the thought processes of the grand jurors. Movants have shown no reason why their situation should be treated any differently.

Movants' reliance upon In Re Grand Jury Investigation of Banana Industry, 214 F.Supp. 856 (D.Md.1963) is misplaced. In that case the Court did *not* hold that the subject of the investigation, United Fruit, had any *right* to submit memorandum or be heard regarding the transfer of testimony and evidence from one grand jury to another. A hearing was granted by Judge Thomsen as a matter of fundamental fairness, since all material was not to be transferred. On the other hand, in the instant case the transfer order carefully emphasized that *all* testimony and exhibits must be transferred. This Court agrees wholeheartedly with Judge Thomsen that it could have been potentially unfair and prejudicial to allow the United States Attorney to select portions of the grand jury testimony for transfer, or to simply allow summaries of testimony to be transferred.[22]

■ Movants insist that the Corpus Christi grand jury acted with such great speed after the transfer of the material, that it was physically impossible for it to have given proper consideration to the evidence. This issue could not have been determined prior to transfer, and certainly cannot serve retroactively as a basis for this Court to have granted a

hearing. Movants also claim that it was improper for the foreman of the San Antonio grand jury to appear before the Corpus Christi grand jury after the transfer was effected. Obviously, this Court could not have foreseen the events transpiring subsequent to the transfer, and thus all allegations attacking actions taken by the Corpus Christi grand jury must be addressed to the judge having supervision over that grand jury.

If it is proper for a grand jury to base an indictment upon hearsay evidence, and it is, Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956),[23] then there would seem to be little to differentiate the evidence transferred in this case from hearsay normally considered acceptable. Assuming that the written documents and records fall within the hearsay classification, then they certainly constitute the best kind of hearsay. Similarly, the court reporter's transcript of the grand jury testimony is written hearsay only in the most peripheral sense, as it accurately details exactly what was said by the witnesses. The only procedure not utilized by the grand jury was to avail itself of the opportunity to "eyeball" the witnesses and it could have done this if it had felt it necessary to do so.

■ The assertion by movants that Local Rule 14, which requires that motions be in writing and served upon opposing counsel, is applicable to the instant case must also be rejected. The only extant motion was that of the government for transfer of the evidence, and grand jury proceedings bear no resemblance to the kind of adversary proceedings contemplated by the rule.

At the hearing conducted by this Court on August 27, 1973, full opportunity was afforded the movants to dem-

---

21. *See generally*, 1 Wright & Miller, Federal Practice and Procedure: Criminal § 106.

22. *See* United States v. Garcia, 420 F.2d 309 (2d Cir. 1970); In Appeal of Kitzer, 369 F. 2d 677 (7th Cir. 1966); United States v. E. H. Koester Bakery Co., 334 F.Supp. 377 (D.Md.1971).

23. "A grand jury investigation . . . may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. Branzburg v. Hayes, 408 U.S. 665, 701, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1973).

onstrate what evidence they would have offered if a hearing had been held prior to the entry of the May 3rd order transferring the testimony. The only substantive item mentioned by the movants was their contention that the motives, reasons and thought processes of the United States Attorney were suspect. When given the opportunity on August 27th, the movants were unable to offer any relevant and material evidence that would have changed the result, and that could have been appropriately received during a hearing on the government's application for transfer.

Having considered all of the above, this Court finds that regardless of what was intended by the local plan with respect to the places of indictment and trial of a defendant in the district, there was no intention whatever to place an embargo upon all exhibits and testimony presented to one grand jury regarding criminal activities alleged to have taken place in a different division of the same district. To so hold would be contrary to well established principles crucial to the grand jury's operations, and would flatly contradict a long and unbroken line of case law.

The motions to vacate this Court's order of May 3, 1973, and to suppress the evidence obtained through the process of the May 1972 grand jury in San Antonio are denied.

In rejecting said motions, this Court holds that the subpoenas issued and the evidence gathered by the San Antonio grand jury were neither illegal, unconstitutional nor beyond the jurisdiction and authority of said grand jury; and further that the Order of May 3, 1973, entered pursuant to this Court's supervisory authority over the San Antonio grand jury did not violate the rights of any of the movants.

No opinion whatever is expressed herein with reference to whether or not the transferred testimony and evidence, or any part thereof, should be disclosed to movants, or either of them; nor is any opinion whatever expressed with reference to whether or not the transferred testimony and evidence, or any part thereof, should be suppressed; it being the opinion of this Court that such matters are more properly left to the sound discretion of the judge before whom the case is now pending in the Corpus Christi Division of the Southern District of Texas.